**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**DETROIT**

_____

**DEQUAN A.,**
**PARENT AND NEXT FRIEND OF J.L.**
**A MINOR**

                        **Plaintiffs,**                    **Civil Action No. _____**

        **v.**

**Serve:**                                                **COMPLAINT**
**GRETCHEN WHITMER**
**IN HER OFFICIAL CAPACITY AS**
**GOVERNOR OF THE**
**STATE OF MICHIGAN**
**OFFICE OF THE GOVERNOR**
**THE MICHIGAN STATE CAPITOL**


**Serve:**
**DR. MICHAEL F. RICE, Ph.D.**
**IN HIS OFFICIAL CAPACITY AS**
**STATE SUPERINTENDENT**
**MICHIGAN DEPARTMENT OF EDUCATION**


**Serve:**
**DR. PAMELA PUGH, Ph.D.**
**IN HER OFFICIAL CAPACITY AS**
**PRESIDENT STATE BOARD OF EDUCATION**
**MICHIGAN DEPARTMENT OF EDUCATION**


**Serve:**
**DANA NESSEL, ESQUIRE**
**IN HER OFFICIAL CAPACITY AS**
**ATTORNEY GENERAL FOR**
**THE STATE OF MICHIGAN**

**Serve:**
**DR. NIKOLAO VITTI**
**IN HIS OFFICIAL CAPACITY AS**
**SUPERINTENDENT OF**
**THE DETROIT PUBLIC SCHOOLS**
**COMMUNITY DISTRICT**


**Serve:**
**JANCE C. MITCHELL FORD, ESQUIRE**
**IN HER OFFICIAL CAPACITY AS**
**GENERAL COUNSEL FOR THE**
**THE DETROIT PUBLIC SCHOOLS**
**COMMUNITY DISTRICT**


**Defendants**

_____

## COMPLAINT

**COMES NOW** the Plaintiffs, Dequan A. as the parent and next friend of his minor son J.L.[1],

by and through their counsel, Roy Carleton Howell, and respectfully state their case before this

Honorable Court as follows.

_____

[1] Pursuant to the _ORDER_ of Administrative Law Judge Alexander Cartwright the minor was identified in all administrative pleading before the Michigan Office of Administrative Hearings and Rules as J.L.  _In the Matter of D.A., & U.L. o/b/0 J.L._ v. _Detroit Public Schools Community District,_ Docket No: 23-003783, Case No: DP-23-0008, Agency: Education, Case Type: ED. Sp. Ed. Regular.

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

III.    DEMAND FOR JURY TRIAL ON NEGLIGENCE ALLEGATION . . . . . . . . . . . . . . . . . . . . . 10

IV.    THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

V.    FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

(ALLEGATION-1) *INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT,*
*20 U.S.C. §§ 1400 – 1461* VIOLATIONS . . . . . . . . . . . . . . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

(i.)    *Triennial re-evaluation per 34 CFR § 300.303(a)(b)(2)* . . . . . . . . . . . . . . . . . . . . . . . . .15

(ii.)    *Congress intended J.L. to be timely evaluated and provided FAPE* . . . . . . . . . . . . . . 16

(iii.)    *Required Notice to Plaintiff Dequan A. of IEP meeting per 34 CFR § 300.322* . . . . . . 17

(iv.)    *Defendants' denial of FAPE to J.L. in violation of federal law* . . . . . . . . . . . . . . . . . . .18

(v.)    *The failure to produce all Hearing transcripts gratis to Plaintiffs violated*
*34 CFR § 300.512* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

(vi.)    *Defendants are unable to provide J.L. FAPE, thus residential placement is proper* . . 19

(ALLEGATION-2) CIVIL ACTION FOR THE DEPRIVATION OF RIGHTS,
*42 U.S.C. § 1983 – LITERACY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

(i)    *J.L.'s Literacy Is a Fundamental Right, and there is a disparity in State education*
*resources to J.L. and those* similarly situated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

(ii)    *The Meaning of Literacy and Literacy Instruction for J.L.* . . . . . . . . . . . . . . . . . . . . . . .21

(iii)    *J.L.'s Literacy Guarantee Is the Foundation of Citizenship and Well-Being in a*
*Democratic Society* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*(iv)* *The Tradition of Compulsory Education in the United States Guarantees J.L.'s Literacy Right* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*(v)* *J.L.'s Exclusion from Access to Literacy Creates an Enduring Stigma* . . . . . . . . . . . . .34

*(vi)* *DPS failed to provide J.L. Literacy because it is a continuing failed system, and Michigan is Ultimately Responsible* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

(ALLEGATION-3) MICHIGAN IS RESPONSIBLE AND LIABLE TO J.L. FOR PUBLIC EDUCATION PURSUANT TO STATE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*(i)* *Michigan Constitution guarantees J.L.'s free public education and the State has failed to execute a policy to insure J.L. a free public education pursuant to the Michigan Constitution* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

(ALLEGATION-4) DECIMATION OF DETROIT PUBLIC SCHOOLS, FAILURE TO EDUCATE J.L., AND INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

(ALLEGATION-5) CONTINUOUS FAILED STATE INTERVENTIONS TO ADDRESS LITERACY CRISIS IN DETROIT, AND J.L. HAS A FUNDAMENTAL RIGHT TO LITERACY PIURSUANT TO *GARY B ET AL.. V. WHITMER ET AL, 957 F.3d 616 (6th Cir. 2020)* WHICH HAS BEEN VIOLATED . .41

*(i)* *Gary B., et al. v. Whitmer, et al, 957 F.3d 616 (6th Cir. 2020)* . . . . . . . . . . . . . . . . . . . .41

(ALLEGATION-6) M-STEP STANDARDIZED TEST SCORES PROVE DEFENDANTS' FAILURE TO PROVIDE LITERACY AND *FAPE* TO J.L. SUCH FAILURE VIOLATES *IDEA*, AND *GARY B. ET AL, V. WHITMER, ET AL, 957 F.3d 616, 642 (6th Cir. 2020),* AND THE MICHIGAN CONSTITUTION . . . . 42

*(i)* *The Michigan Student Test of Educational Progress ("M-STEP") is very Significant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

(ALLEGATION-7) DEFENDANTS' DENIAL OF LITERACY AND *FAPE* TO J.L. AND THOSE SIMILARILY SITUATED, DENIES THEM GRADUATION AND COLLEGE ATTENDANCE, AND VIOLATES RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

(ALLEGATION-8) THERE ARE INSUFFICIENT ALLOCATED RESOURCES, TRAINED SPECIAL EDUCATIONAL PROFESSIONALS, SMALL CLASS SIZES, SECURITY, AND TRANSPORTATION SERVICES TO PROVIDE J.L. AND STUDENTS SIMILARILY SITUATED WITH LITERACY AND *FAPE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    *(i)*    *Intervention and Remediation for J.L.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    *(ii)*    *Extreme Heat, and Necessity for Air-Conditioned Summer School for ESY* . . . . . . . . . 46

(ALLEGATION-9)  FAILURE TO PROVIDE J.L. A SAFE SCHOOL ENVIRONMENT FOR LEARNING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    *(i)*    *Absence of Support to Address Trauma and Social-Emotional Health* . . . . . . . . . . . . 46

(ALLEGATION-10)  UNSUPPORTED AND UNSTABLE TEACHING STAFF AND SUPPORT STAFF INJURE J.L. AND OTHERS SIMILARILY SITUATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    *(i)*    *Vacancies and Lack of Qualified, Full-Time Teachers, Professionals, and staff Injured J.L. and others Similarly Situated* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    *(ii)*    *Legislation Which Permitted Non-Certtificated Teachers Injured J.L. and Others, and is a continuing legacy of problems* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

(ALLEGATION-11)  AS A PROXIMATE RESULT OF DEFENDANTS' FAILURE TO PROVIDE A SAFE SCHOOL ENVIRONMENT TO J.L., HE HAS SUSTAINED PHYSICAL INJURY, EMOTIONAL HARM, AND DEFENDANTS ARE LIABLE FOR THIS CHILD'S INJURIES . . . . . . . . . . . . 50

    VI.    <u>AVERMENTS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

FIRST CAUSE OF ACTION – Violation of *Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

SECOND CAUSE OF ACTION- J.L. as a disabled student has a fundamental right to literacy pursuant to <u>*Gary B., et el., v. Whitmer, et al, 957 F.3d 616 (6th Cir. 2020),*</u> and that basic right has been violated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

THIRD CAUSE OF ACTION – *Violation of 42 U.S.C. § 1983* (J.L. Against All Defendants for Violation his Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

FOURTH CAUSE OF ACTION - *Violation of 42 U.S.C. § 1983* (J.L. Against All Defendants for Violation his Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution based upon State Created Danger) . . . . . . . . . . 53

FIFTH CAUSE OF ACTION - *Violation of the ADA, 42 U.S.C. § 12101 (a)(1)* (J.L. Against All Defendants for Maintaining a Detroit School System Which Discriminates, Endangers Children with Learning Disabilities, Emotional Disabilities . . . . . . . . . . . . . . . . . . . . . .54

SIXTH CAUSE OF ACTION - (All Plaintiffs Against All Defendants for Declaratory Relief) . . . . . . . 55

SEVENTH CAUSE OF ACTION – (All Plaintiffs Against All Defendants for Negligence) . . . . . . . . . .55

VII.     PRAYER FOR REMEDIES FOR PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

(a)     PURSUANT TO *BOARD OF EDUCATION OF FAYETTE COUNTY* V. *L.M., 478 F.3d 307, 316 (6th Cir. 2007)* THIS COURT MAY GRANT PLAINTIFFS COMPENSATORY EDUCATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

(b)     PURSUANT TO *34 CFR § 300.303(a)(b)(2)*THIS COURT MAY ORDER DEFENDANTS TO EXECUTE APPROPRIATE EVALUATIONS OF J.L. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

(c)     PURSUANT TO *34 CFR § 300.105* THIS COURT MAY ORDER DEFENDANTS TO EVALUATE AND PROVIDE J.L. NECESSARY AND PROPER ASSISTIVE TECHNOLOGY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

(d)     IT IS NECESSARY AND PROPER FOR J.L. TO RECEIVE *ESY* TO PREVENT REGRESSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

(e)     J.L.'S NEIGHBORHOOD SCHOOL IS CLOSED IN SUMMER AND HE WILL REQUIRE BUS TRANSPORTATION FOR *ESY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .60

(f)     DEFENDANTS FAILED TO PROVIDE PLAINTIFF-DEQUAN A. NOTICE OF THE *IEP*
        MEETING OF J.L. PURSUANT TO *34 CFR § 300.322*. THIS COURT MUST ORDER
        DEFENDANTS TO PROVIDE PLAINTIFFS NOTICE OF *IEP* MEETINGS . . . . . . . . . . . . . . . 60

(g)     THIS COURT HAS AUTHORITY TO COMPEL DEFENDANTS TO PROVIDE PLAINTIFF-
        DEQUAN A. A FULL AND COMPLETE COPY OF ALL HEARING AND PRE-HEARING
        TRANSCRIPTS PURSUANT TO *34 CFR § 300.512* AND AT NO CHARGE . . . . . . . . . . . 61

(h)     THIS COURT MUST ORDER DEFENDANTS TO CONSIDER RESIDENTIAL
        PLACEMENT OF J.L. IN A PRIVATE SPECIAL EDUCATION SCHOOL BECAUSE OF
        ITS INABILITY TO PROVIDE *FAPE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62

*(i)*     PLAINTIFF-J.L. HAS A BASIC RIGHT TO LITERACY AS GUARANTEED BY LAW, AND
        THIS COURT MUST ENFORCE J.L.'S RIGHTS PURSUANT TO *GARY B., ET AL. V.
        WHITMER, ET AL, 957 F.3d 616 (6th Cir. 2020)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

(j)     PLAINTIFFS HAVE A STATUTORY RIGHT FOR ATTORNEYS' FEES AND COSTS
        PURSUANT TO THE INDIVIDUALS WITH DISABILITIES EDUCATION IPROVEMENT
        ACT, *20 U,S.C. § 1400 ET SEQ* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

(k)     PLAINTIFFS HAVE A STATUTORY RIGHT FOR ATTORNEYS' FEES AND COSTS
        PURSUANT TO *42 U.S.C. § 1983* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

(l)     PLAINTIFFS PRAY FOR $250,000 IN COMPENSATORY DAMAGES, AND
        $500,000 IN EXEMPLARY DAMAGES BASED UPON DEFENDANTS' NEGLIGENCE . . . .64

(m)     PLAINTIFFS PRAY THAT THIS COURT MAINTAIN JURISDICTION OVER THIS CASE
        UNTIL ALL JUDICIAL ORDERS ARE COMPLIED WITH BY THE PARTIES . . . . . . . . . . . . 64

(n)     PLAINTIFFS PRAY THAT THIS COURT SHALL PROVIDE ALL RELIEF IT DEEMS JUST
        AND PROPER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**(I.)** **PRELIMINARY STATEMENTS**

1.  This is an appeal of the 18th August 2023 <u>Decision and Order</u> of Administrative Law

Judge (ALJ) Alexander Cartwright,[2] which violated the *Individuals with Disabilities Education*

*Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461,* federal rights of Plaintiffs, the laws of the

United States, and the intent of Congress.

2.  The parties filed <u>Closing Argument Briefs,</u> and on 18th August 2023 AJL Alexander

Cartwright filed a 37-page <u>Decision and Order</u> which conflicted with the evidence, the

administrative record, federal laws, and reached incorrect and unreasonable conclusions in

contradiction to the intent of Congress, and the federal common law. *See, Exhibit 1*. Plaintiffs

respectfully differ with ALJ Cartwright, and seek judicial review in compliance with ALJ

Cartwright's <u>Decision and Order</u>.  Regarding Plaintiffs' right to judicial review, ALJ Cartwright

wrote:

> A party aggrieved by this decision may seek judicial review by
> filing an action in a court of competent jurisdiction within 90
> days of the date of this order.   *See, Exhibit 1, at p. 36.*

3.  Plaintiffs are aggrieved by ALJ Cartwright's determination, and in good faith seek

judicial review before this Honorable Court pursuant to his <u>Decision and Order</u>.

4.  This is a cause of action against the State of Michigan, and Detroit Public Schools

Community District (DPS) brought under *42 U.S.C. § 1983* based on the Due Process and Equal

Protection Clauses of the Fourteenth Amendment of the United States Constitution, and other

---

[2] *See, In the Matter of <u>D.A., & U.L. o/b/0 J.L</u>. v. <u>Detroit Public Schools Community District</u>, Docket No: 23-003783, Case No: DP-23-0008, Agency: Education, Case Type: ED. Sp. Ed. Regular.* (Michigan Office of Administrative Hearings and Rules).

federal rights. As an indigent, inner-city disabled child J.L.'s federal rights are violated.

5.   This is a cause of action against the State of Michigan, and Detroit Public Schools
Community District (DPS) pursuant to *Gary B., et al. v. Whitmer, et al., 957 F.3d 616, 662 (6th Cir. 2020)* which held that children have a fundamental right to a basic education.

6.   This is a cause of action against the State of Michigan, and Detroit Public Schools
Community District (DPS) pursuant to Michigan's current State Constitution which mandates
that "[t]he Legislature shall maintain and support a system of free public elementary and
secondary schools as defined by law," *Mich. Const., art. VIII, § 2*, and vests "leadership and
general supervision over all public education" in the State Board of Education, *id. art. VIII § 3.*

7.   This is a cause of action against the State of Michigan, and Detroit Public Schools
Community District (DPS) for negligence. *See, Hill v. Sears, Roebuck & Co, 492 Mich 651, 660;
683 NW2d 587 (2004).* J.L. has realized aggravated felonious assault, and continues to suffer
bullying and endangerment. J.L. stated at a psychiatric evaluation that he wants to harm himself
at school.

## (II.)   JURISDICTION AND VENUE

8.   This Court has jurisdiction pursuant to the *Individuals with Disabilities Education
Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461.*

9.   This Court has jurisdiction pursuant to *Rehabilitation Act of 1973 (Section 504), 29 U.S.C.
§ 794.*

10.  This Court has jurisdiction pursuant to *42 U.S.C. § 1983 Civil Action for Deprivation of
Rights.*

11. This Court has jurisdiction pursuant to *28 U.S.C § 1331 Federal Question*.

*12.* This Court has jurisdiction pursuant to *28 U.S.C § 1343 Civil Rights and Elective Franchise*.

13. Declaratory relief is authorized by *28 U.S.C. §§ 2202 and 2202*.

*14.* This Court has jurisdiction pursuant to the *Americans With Disabilities Act, 42 U.S.C. § 12101(a)(1)*.

15. This Court has jurisdiction pursuant to *Mich. Const., art. VIII, § 2*.

*16.* This Court has jurisdiction pursuant to common law negligence. *See, Hill* v. *Sears, Roebuck & Co, 492 Mich 651, 660;  683  NW2d 587 (2004)*.

17. Venue is proper in this Court pursuant to *28 U.S.C. § 1391*.

### (III.)   DEMAND FOR JURY TRIAL ON NEGLIGENCE ALLEGATION

18. Plaintiffs demand a jury trial on the cause of action of common law negligence as pled in this Complaint.

### (IV.)   THE PARTIES

**(Plaintiffs)**

19. Dequan A. is a Black-American citizen of the United States, resident of the State of Michigan, and father of J.L.  Dequan A. brings this suit as the father and next friend of the minor J.L. He is a licensed Michigan truck driver.

*20.* J.L. is a 13-year-old, indigent, Black-American minor who currently attends the Detroit Public Schools Community District. He has severe learning disabilities, emotional disabilities, and is severely academically behind. He is learning disabled (L.D) and emotionally disturbed (E.D.) and has received special education benefits pursuant to the *Individuals with Disabilities*

*Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461.*

**(Defendants are liable in their official capacities)**

    *21.* Gretchen Whitmer is the governor of Michigan, and is sued in her official capacity. Education in Michigan is not a mere local concern, but belongs to the State at large. *Board of Education v. Bacon, 162 N.W. 416, 416 (Mich. 1917)* (quoting *Collins v. City of Detroit, 161 N.W. 905, 907 (Mich. 1917).* Under Michigan law, the state has oversight authority over school districts and public schools within the state. *See, Mich. Comp. Laws §§ 380.1281, 388.1007, 388.1009.* State funding and oversight provisions place public schools "under the ultimate and immediate control of the state and its agents." *Council of Orgs. & Others for Educ. About Parochild, Inc. v. Engler, 566 N.W. 2d 208, 216 (Mich. 1997).* Pursuant to *Gary B., et el. v. Whitmer, et. al, 957 F.3d 616 (6th Cir. 2020),* Defendant Whitmer is a proper party defendant. As chief executive officer of the State of Michigan, Defendant Whitmer has the ultimate obligation to ensure that all Michigan public school students receive their fundamental right to literacy.

    *22.* Dr. Michael F. Rice is the State Superintendent of the Michigan Department of Education, and is sued in his official capacity. Education in Michigan is not a mere local concern, but belongs to the State at large. *Board of Education v. Bacon, 162 N.W. 416, 416 (Mich. 1917) (quoting Collins v. City of Detroit, 161 N.W. 905, 907 (Mich. 1917).* Under Michigan law, the state has oversight authority over school districts and public schools within the state. *See, Mich. Comp. Laws §§ 380.1281, 388.1007, 388.1009.* State funding and oversight provisions place public schools "under the ultimate and immediate control of the state and its agents." *Council of Orgs. & Others for Educ. About Parochild, Inc. v. Engler, 566 N.W. 2d 208, 216 (Mich. 1997).*

Pursuant to *Gary B., et el. v. Whitmer, et. al, 957 F.3d 616 (6th Cir. 2020),* Defendant Rice is a proper party defendant.  The Superintendent is appointed by and responsible to the State Board of Education. *Const. 1963, art 8, § 3; Mich. Comp. Laws § 388.1014*. He is the principal executive officer of the Michigan Department of Education, the department of the State of Michigan government responsible for administering and enforcing laws related to public education. *Mich. Comp. Laws § 16.400-16.402.* The Superintendent sits on the Governor's Cabinet, the State Administrative Board, and acts as chair and a non-voting member of the State Board of Education. The Superintendent is responsible for the implementation of bills passed by the Legislature and policies established by the State Board of Education. He is also the primary liaison to the United States Department of Education and other federal agencies.

23. Dr. Pamela Pugh is the President of the Michigan State Board of Education, and is sued in her official capacity. Education in Michigan is not a mere local concern, but belongs to the State at large. *Board of Education* v. *Bacon,* 162 N.W. 416, 416 (Mich. 1917) (quoting *Collins* v. *City of Detroit, 161 N.W. 905, 907 (Mich. 1917)*. Under Michigan law, the state has oversight authority over school districts and public schools within the state. *See, Mich. Comp. Laws §§ 380.1281, 388.1007, 388.1009.*  State funding and oversight provisions place public schools "under the ultimate and immediate control of the state and its agents." *Council of Orgs. & Others for Educ. About Parochild, Inc.* v. *Engler, 566 N.W. 2d 208, 216 (Mich. 1997).* Pursuant to *Gary B., et el. v. Whitmer, et. al,  957 F.3d 616 (6th Cir. 2020).* Defendant Pugh is a proper party defendant. The State Constitution provides that the State Board of Education retains "[l]eadership and general supervision over all public education" and is the "planning and coordinating body for all public education." *Const. 1963, art. 8, § 3; see also Michigan Compiled Laws ("Mich. Comp. Laws") §*

12

*388.1009 et seq.*

24. Danna Nessel is the attorney general for the State of Michigan, and is responsible for Michigan's compliance with the law. She is sued in her official capacity. Education in Michigan is not a mere local concern, but belongs to the State at large. *Board of Education v. Bacon, 162 N.W. 416, 416 (Mich. 1917) (quoting Collins v. City of Detroit, 161 N.W. 905, 907 (Mich. 1917).* Under Michigan law, the state has oversight authority over school districts and public schools within the state. *See, Mich. Comp. Laws §§ 380.1281, 388.1007, 388.1009.* State funding and oversight provisions place public schools "under the ultimate and immediate control of the state and its agents." *Council of Orgs. & Others for Educ. About Parochild, Inc. v. Engler, 566 N.W. 2d 208, 216 (Mich. 1997).* Pursuant to *Gary B., et el. v. Whitmer, et. al, 957 F.3d 616 (6th Cir. 2020),* Defendant Nessel is a proper party defendant.

25. Dr. Nikolai Vitti is the superintendent of Detroit Public Schools Community District and is responsible for the day-to-day administration of Detroit Public Schools. *See, e.g., Mich. Comp. Laws § 380.1282.* He is sued in his official capacity.

26. Janice C. Mitchell Ford is the general counsel of Detroit Public Schools Community District and is responsible for the school system's compliance with the law. She is sued in her official capacity.

## (V.) FACTUAL ALLEGATIONS

**(ALLEGATION-1) *INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT,* 20 *U.S.C. §§ 1400 – 1461 VIOLATIONS.***

27. J.L. began his schooling within the Detroit Public Schools Community District (DPS), briefly transferred to George Crockett Charter where he was expelled in early April 2022, and not allowed to re-enter DPS until September 2022.

*28.* J.L. has been determined to qualify for benefits and services pursuant to *the Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461.* J.L is learning disabled (LD) and suffers emotional disability (ED).

29. A September 5, 2019 psychiatric evaluation of J.L. conducted by the Children's Center of Detroit Michigan found very significant medial issues for the child, *to wit:* (i) problems concentrating, completing tasks, following directions; (ii) anger issues, blames others, can become aggressive; (iii) forgetful; (iv) statements to harm self: (v) speech delays; (vi) history of anxiety, depression, and autism in family; (vii) impulsivity; (viii) oppositional behaviors; (ix) took Ritalin 5MG tablet for ADHD.

30. The September 5, 2019 psychiatric evaluation of J.L. recommended that J.L. be referred for psychological testing to assess his cognitive functioning.

31. J.L.'s Michigan Student Test of Educational Progress (M-Step) scores illustrate he is many years behind in academic achievement. Although J.L. has been assigned some passing grades, his ability to read, write and perform mathematics is abysmal, and very behind grade

level. J.L. is being passed from year-to-year even though he is not learning.

(i.)     *Triennial re-evaluation per 34 CFR § 300.303(a)(b)(2)*

32. Although the Children's Center's September 5, 2019 psychiatric evaluation of J.L.

recommended that J.L. be referred for psychological testing to assess his cognitive functioning,

DPS without even having possession of this very detailed psychiatric report failed to conduct

J.L.'s re-evaluation in violation of *34 CFR § 300.303(a)(b)(2).*

33. Although the parents never waived their rights to triennial re-evaluations of J.L. pursuant

to *34 CFR § 300.303(a)(b)(2)*, DPS fraudulently in an October 17, 2022 REED Evaluation Report

recorded:

> Due to J.L. being a new student at Burton International, the team
> and parent verbally agreed at the beginning of the school year
> that a formal evaluation is not warranted at this time current
> time and can be re-considered on an as-needed basis.

34. DPS's agents and administrators repudiated, disavowed, and acknowledged that J.L.'s

parents never "verbally agreed at the beginning of the school year that a formal evaluation is

not warranted at this time current time and can be re-considered on an as-needed basis." In

short, DPS admitted on the record that they intentionally misrepresented the facts.

35. DPS failed to conduct triennial re-evaluations of J.L. pursuant to *34 CFR §*

*300.303(a)(b)(2)* even though there was need and legal requirements. Therefore, the DPS failure

to conduct triennial re-evaluations denied J.L. a free appropriate public education *(FAPE)*. *See,*

*Jim Thrope School District,* 26 IDELA 1347 (1997).

*36.* On August 18, 2023 the ALJ committed reversible error by ruling that DPS was not

obligated to perform triennial re-evaluations of J.L. pursuant to *34 CFR § 300.303(a)(b)(2)* even

though there was need and all legal requirements were met.

### *(ii.)*     *Congress intended J.L. to be timely evaluated and provided FAPE*

37. Congress intended that learning disabled (LD), emotionally disturbed (ED) children like

J.L be identified quickly, and provided services. In the Congressional Record of the 94th

Congress, Senator Harrison Walker stated:

> . . . I cannot emphasize enough that delay in resolving matters
> regarding the education program of a handicapped child is
> extremely detrimental to his development.  The interruption
> or lack of the required special education and related services
> can result in a substantial setback to the child's development.
> *U.S. Congressional Record, 94[th] Congress, 1[st] Session, Vol. 121
> -Part 29, p. 37416 (Nov. 18[th] – Dec. 2[nd] 1975).*

38. In *Spiegler v. District of Columbia, 866 F.2d 461, 467 (D.C. Cir. 1989), (citing 121 Cong.*

*Rec. 37,416 (1975)* (statement of Sen. Williams)), that court also acknowledged that Congress

"intended to ensure prompt resolution of disputes regarding appropriate education for

handicapped children."

*39.* Federal courts have taken judicial notice of the intent of Congress by citation of Senator

Williams' above speech from the Congressional Record. In *Herbin v. District of Columbia, 362*

*F.Supp.2d 254, 260 (2005)* that court cited Senator Williams' speech from the Congressional

Record, and went on to find that the plain meaning of *IDEA* defined rights and obligations.

Here, *sub-judice,* J.L.'s *IDEA* rights are defined by *inter-alia*: (a) *Re-evaluations-34 CFR § 300.303;*

(b) *Parental Participation-34 CFR § 300.322;* (c) *Production of all Hearing and Pre-Hearing*

*Transcripts gratis-34 CFR § 300.512;* (d) compensatory education- *Board of Education of Fayette County v. L.M., 478 F.3d 307, 316 (6th Cir. 2007);* (e) *Evaluate J.L. for necessary assistive technology-34 CFR § 300.105;* (f) *Provide J.L necessary ESY- Colchester School District, 30 IDELR 221, 224 (1999).*

*40.* The plain mean of the *IDEA* as interpreted in *Herbin v. District of Columbia, Id.* (*expression unius est exclusio alterius*), shows Congress intended Plaintiffs to prevail *sub-judice*. This case at bar is simple and straightforward, therefore the ALJ committed reversible error.

### *(iii.)*      *Required Notice to Plaintiff Dequan A. of IEP meeting per 34 CFR § 300.322*

*41.* DPS knew the direct telephone number of J.L.'s father (Plaintiff Dequan A.) and failed to invite him to the October 17, 2022 Individual Education Plan meeting *(IEP)* and REED meeting in violation of *34 CFR § 300.322*. The denial of J.L.'s father participation in the *IEP* and REED was a denial of *FAPE* to J.L. *See, Independent School District No. 11, 28 IDELR  1144, 1153 (Parental Involvement) (1998).* "Parents are critical to the *IEP* process and must be in attendance, which means that the school should consult with the parent *prior* to setting the *IEP* day and time to ensure the parent's availability." *See, Cannon, Gregory, and Waterstone, "A Solution Hiding in Plain Sight: Special Education and Better Outcomes for Students with Social, Emotional Challenges," 41 Fordham Urb. L.J. 403, 486 (2013).*

42. DPS' failure to invite J.L.'s father to the October 17, 2022 *IEP* and REED meetings resulted in omission of the critical October 17, 2022 medical and psychiatric information which the father had in his possession and would have introduced at the meeting.

43. On August 18, 2023 the ALJ committed reversible error by failing to find that DPS violated *34 CFR § 300.322*.

### *(iv.)    Defendants' denial of FAPE to J.L. in violation of federal law*

44. DPS executed a defective *IEP* for J.L. which relied upon an obsolete, one-page prescription by a Dr. Rajendra Kanneganti of the Children's Center, and a dated *IEP*.  DPS executed an *IEP* for J.L. without even seeing his most recent September 5, 2019 Children's Center's psychiatric evaluation, which was likewise dated and over three years old.  The evidence from the administrative hearing record shows DPS violated *20 USCA § 1412*, and *34 CFR § 300.303(a)(b)(2)*.  Therefore, the DPS' 2022 *IEP* denied J.L. *FAPE* by omission and failure to consider serious emotional and psychological information, and to conduct crucial re-evaluations.

45. On August 18, 2023 the ALJ committed reversible error by failing to find that DPS denied J.L. *FAPE* in violation of *20 USCA § 1412, and 34 CFR § 300.303(a)(b)(2)*.

### *(v.)    The failure to produce all Hearing transcripts gratis to Plaintiffs violated 34 CFR § 300.512*

46. Preliminary Hearing on Summary Judgment, other matters, and Hearings were held on: February 1st, February 23rd, April 12th, May 15th, May 16th, May 17th, and May 18th. Plaintiffs requested gratis copies of transcripts pursuant to *34 CFR § 300.512*. In compliance with the law the ALJ provided transcripts for May 15th, May 16th, May 17th, and May 18th gratis, but refused to provide Hearing transcripts for February 1st, February 23rd, April 12th at no charge to plaintiffs.

*47.* The intentional failure to deny Plaintiffs all Hearing transcripts at no charge in compliance with *34 CFR § 300.512* violated Plaintiffs due process rights of the Fourteenth Amendment of the United States Constitution. *42 U.S.C. § 1983 Civil Action for Deprivation of Rights.*

**(vi.)    Defendants are unable to provide J.L. FAPE, thus residential placement is proper**

48. The *IDEA* permits Defendants to place children with disabilities in private schools. Although Defendants are required to provide *FAPE*, the "public" education requirement does not mandate placement in a public school in all cases.

49. Certain special needs children may be placed in or referred to a private school or facility by a public agency as a means of providing special education and related services.

**50.** The Shortridge Academy Boarding School environment will provide *FAPE, the least restrictive environment (LRE),* safe environment, and is proper for J.L. who has numerous L.D, and E.D. disabilities.  In *Tuscon Unified School District v. Murray ex rel. Kline, 33 IDELR 239 (D. Ariz. 2000)* that court found that in some cases residential facilities for disabled children is necessary for *FAPE* with the *LRE.*

**(ALLEGATION-2) CIVIL ACTION FOR THE DEPRIVATION OF RIGHTS, *42 U.S.C. § 1983 – LITERACY.***

**(i)     J.L.'s Literacy Is a Fundamental Right, and there is a disparity in State education resources to J.L. and those similarly situated juxtaposed to non-minorities and non-disabled minorities**

51. J.L.'s M-STEP scores for reading and mathematics are abysmal, and demonstrate he is years behind grade level. J.L. is being passed from year-to-year even though he is not learning.

This child like so many children within DPS cannot read, write, or perform mathematics at grade level. J.L. is not acquiring necessary and proper literacy skills to function in society. Likewise, are children similarly situated to J.L.

52. Literacy plays a unique role in our democracy, enabling people to access the rights and discharge the obligations of citizenship and participation in public and private life. Literacy is so important that every state commits to teach it to all children, and indeed requires children to attend school so it can do so. Yet the State of Michigan, which directly oversees public education in Detroit, has functionally excluded J.L. from its statewide system of public education, denying him the opportunity to attain literacy. Achievement data generated and collected by the State documents the near-universal failure to meet proficiency standards in Detroit schools and the consequent high drop-out and low college attainment rates for DPS children in general. These dramatic proficiency shortfalls result predictably and inevitably from the systemic failures in DPS' schools that are antithetical to learning and teaching. Despite its awareness of this education crisis, the State has failed to take sufficient measures to maintain and ensure that effective literacy instruction is available to J.L. and all students like J.L.

53. Literacy is central to the American tradition of education; in fact, it is the basic unit of education. Literacy is necessary for success not only in English/Language Arts, but also for subject-matter competency in other core subject areas like history, science, and math. As the U.S. Supreme Court has repeatedly emphasized and decades of social science confirm, literacy is essential to succeed in higher education and the workplace, to be an informed citizen capable of participating in a democracy, and to secure personal well-being. This is why Michigan—and

every state—makes public education available to every child and even compels children to attend school full time and mandates testing to determine whether students are benefitting from the required instruction. The unique importance of literacy to civic, political, and economic participation means that effectively excluding a discrete class of children like J.L. from the right to an opportunity to attain literacy stamps them with a badge of indignity that will profoundly affect them for the rest of their lives. This stigma places a debilitating burden on these children's morale, psyche, and life chances and creates a caste system that perpetuates the social, economic, and political subordination of low-income communities of color, and the L.D., E.D.

### (ii)     The Meaning of Literacy and Literacy Instruction for J.L.

54. Every schoolchild in America grows up learning the "The Three Rs"—reading, writing, and arithmetic. Since the time of Thomas Jefferson, "[T]he [T]hree R's" have made up the basic, skills-oriented work of schools. *Wisconsin v. Yoder, 406 U.S. 205, 226 n.14 (1972)*. Education experts agree that to succeed as adults in the twenty-first century, children must learn not just the skill to decode letters and words, but the ability to read and write well enough to access knowledge and communicate with the world. These essential knowledge capabilities—which include the ability to compose, comprehend, synthesize, reflect upon, and critique—require conscious and sustained development throughout primary and secondary schooling.[3]

55. The United States Department of Education ("DOE") has operationalized and ratified these concepts in its What Works Clearinghouse Institute of Education Sciences ("IES") Practice Guides, which are prepared by a DOE-appointed and sponsored panel of national literacy

---

[3] *See generally* Catherine Snow *et al.,* "*Preventing Reading Difficulties in Young Children*" (1998).

experts to provide evidence-based recommendations for improving literacy instruction and have been endorsed and adopted by Michigan's Early Literacy Initiative, a major activity of the Michigan Department of Education.[4] The panel defines reading comprehension[5] as *"the process of simultaneously extracting and constructing meaning through interaction and involvement with written language."[6]* The panel explains that "[e]xtracting meaning is to understand what an author has stated, explicitly or implicitly. Constructing meaning is to interpret what an author has said by bringing one's 'capacities, abilities, knowledge, and experiences' to bear on what he or she is reading."[7]

56. Functional adult literacy requires both elementary literacy—the letter-and word recognition abilities and phonetics taught in kindergarten through third grade—and adolescent literacy—the knowledge capabilities that build on primary literacy skills and develop the ability to compose, comprehend, reflect upon, and critique. Because literacy development is progressive and cumulative, evidence-based instruction is required throughout the primary and

---

[4] *See* Early Literacy Task Force, Mich. Ass'n of Intermediate Sch. Adm'rs, Gen. Educ. Leadership Network, Essential Instructional Practices in Early Literacy 1, 5 (2016) (setting forth state task force's conclusions regarding research supported instructional practices that could "make a measurable positive difference in the State's literacy achievement"); see also Early Literacy Initiative Overview, Mich. Dep't. of Educ., http://www.michigan.gov/mde/0,4615,7-140-28753_74161---,00.html#acc2

[5] Reading comprehension is also the measure of literacy used to assess whether students are meeting standards in many nationally-administered achievement tests, including the National Assessment of Education Progress (NAEP), the SAT, and the ACT, as well as Michigan's state achievement examinations, including the Michigan Student Test of Educational Progress (MSTEP) and the Michigan Merit Examination (MME).

[6] T. Shanahan et al., Improving Reading Comprehension in Kindergarten Through 3rd Grade: A Practice Guide 5 (2010). The panel noted that this definition of reading comprehension is consistent with the common and widely used definitions of reading comprehension. *Id.*; *see also* M. Kamil, et al., Improving Adolescent Literacy: Effective Classroom and Intervention Practices (2008).

[7] T. Shanahan *et al., supra* note 4, at 5.

secondary years. J.L lacks all necessary and proper literacy skills.

57. Elementary literacy acquisition—taught in kindergarten through third grade—requires instruction in the foundational areas of alphabetics (phonemic awareness and phonics), fluency, and comprehension (basic vocabulary and text comprehension). Early literacy instruction is designed to develop a child's basic ability to recognize letters and words, understand spelling-sound relationships, and obtain meaning from print. As students progress through elementary school, they must develop a working understanding of how sounds are represented alphabetically, practice reading to achieve fluency with different kinds of texts, attain sufficient background knowledge and vocabulary to render texts meaningful and interesting, learn strategies for monitoring comprehension and repairing misunderstandings, and maintain interest and motivation to read, DPS has failed J.L. in this area.

58. When students reach middle and high school without basic literacy skills, they cannot build on these skills to attain more sophisticated and grade-level appropriate comprehension and fluency in the higher grades. But even for students who reach middle school with adequately developed primary literacy skills, direct literacy instruction cannot end in the elementary years. The basic literacy skills that students develop in early elementary school do not automatically evolve into the higher-level literacy skills needed to succeed in middle school, high school, and ultimately the adult workplace. Rather, dedicated instruction in adolescent literacy (grades four through twelve) must continue throughout secondary school in the areas of comprehension, motivation, word study, fluency, and vocabulary, and literacy instruction must be integrated into content area classes. J.L. lacks basic literacy skills and cannot attain more

sophisticated grade-level academic skills.

59. Because literacy development is cumulative and sequentially dependent, students who have been denied early the opportunity to learn fall further behind with each year of schooling as pre-existing gaps are compounded and expanded. For example, students with low reading comprehension skills have trouble progressing further in school because they cannot read age-appropriate texts. There are very few books written at a third-grade reading level that are cognitively appropriate for high school-aged students, so students who are behind in their literacy development often cannot read texts that can engage and educate them with high school content. Failure to engage students with interesting and developmentally appropriate content relevant to their lives then deters students from investing in further development of their literacy skills, causing these students to fall even further behind. Each day that J.L. is denied independent, cognitive testing as recommended by his September 5, 2019 Children's Center's psychiatric evaluation, he falls hopelessly behind academically.

60. Attaining proficiency in literacy is necessary to achieve mastery of content in all other core subject areas. Without the levels of literacy that the curriculum assumes, students are denied meaningful access to not only content and skills in English Language Arts, but also to mathematics, history/social studies, science, technical subjects, and the visual and performing arts. Students who lack literacy are unable to access word problems in mathematics class, do not sufficiently understand grammatical concepts in English to be able to apply them in foreign language class, lack the vocabulary to express their thoughts in laboratory reports in science class, and lack the reading comprehension skills to access textbooks that deliver high-school

level content in history class. As a result, schools that fail to deliver to students the opportunity

to attain literacy deprive students of the ability to satisfy national and state standards in any

content area and leave students unable to compete with their peers elsewhere in the state and

nationally. As a proximate result of J.L.'s significant deficiencies in literacy, he is unable to

progress in mathematics, history/social studies, science, technical subjects, and the arts.

61. The essential role of literacy, and its role as a gateway to other subject matter content, is

nationally recognized in the development and adoption of Common Core State Standards in

English Language Arts & Literacy in History/Social Studies, Science, and Technical Subjects. The

Common Core standards were developed by education leaders in 48 states with the purpose of

establishing a set of uniform and clear standards that ensure "all students have the skills and

knowledge necessary to succeed in college, career, and life upon graduation from high school,

regardless of where they live."[8] The Common Core English Language Arts/Literacy standards lay

out what students should know and be able to do by the end of each grade to ensure they

graduate from high school prepared for college and career. Michigan adopted the Common Core

standards in June 2010.[9]

### (iii.)   J.L.'s Literacy Guarantee Is the Foundation of Citizenship and Well-Being in a Democratic Society

62. Literacy is, and always has been, uniquely significant to American civic life because it is

essential to the maintenance of a robust and well-functioning democracy and plays a

---

[8] Frequently Asked Questions, Common Core State Standards Initiative,
http://www.corestandards.org/wp-content/uploads/FAQs.pdf.
[9] Common Core Standards Fact Sheet: Frequently Asked Questions, Michigan Department of
Education, available at
https://www.michigan.gov/documents/mde/FAQ_4.10.13_418299_7.pdf.

determinative role in the economic participation, well-being, and life chances of individuals. The

U.S. Supreme Court has repeatedly recognized that literacy lies at the foundation of citizenship

and participation in democratic society. In *Brown v. Board of Education of Topeka, for example,

the* Court eloquently expressed the "importance of education to our democratic society":

> It is required in the performance of our most basic public responsibilities,
> even service in the armed forces. It is the very foundation of good
> citizenship. Today it is a principal instrument in awakening the child to
> cultural values, in preparing him for later professional training, and in
> helping him to adjust normally to his environment.  *See, Brown v. Bd. of
> Ed. of Topeka, 347 U.S. 483, 493 (1954).*

63. In *Plyler v. Doe, 457 U.S. 202 (1982)*, the Court likewise stressed education's

"fundamental role in maintaining the fabric of our society" and the "significant social costs

borne by our Nation when select groups are denied the means to absorb the values and skills

upon which our social order rests." *at 221*. The *Plyler* Court went on to explain, "[b]y denying . .

. children a basic education, we deny them the ability to live within the structure of our civic

institutions, and foreclose any realistic possibility that they will contribute in even the smallest

way to the progress of our Nation." *Id. at 223*. J.L. has a fundamental right to a basic education.

64. **J.L.'s Future Participation in the Political Process:** Literacy is a prerequisite to

constitutionally protected participation in the political process. As the Supreme Court

recognized in *Yoder*, "some degree of education is necessary to prepare citizens to participate

effectively and intelligently in our open political system if we are to preserve freedom and

independence." *406 U.S. at 221.* Without access to basic literacy skills, citizens cannot engage in

knowledgeable and informed voting for the candidates of their choice, much less read and

comprehend the complicated ballot initiatives that populate state and municipal ballots. Nor

can citizens effectively exercise their right to engage in political speech and public discourse regarding the important civil and political issues of the day.

65. **J.L's Future Participation in Activities of Citizenship:** Literacy skills are also necessary to engage in many other activities of citizenship. Applicants seeking to enlist in military service must pass the Armed Services Vocational Aptitude Battery, a multiple-choice test administered on a wide range of subjects including word knowledge and paragraph comprehension. Individuals without basic literacy skills cannot complete written application forms necessary to obtain government entitlements such as Medicare, Medicaid, Social Security Disability Insurance, or General Relief benefits. Nor can they comply with mandatory government requirements such as filing tax forms or selective service registration. As many scholars and commentators have noted, as activities become digitized in the twenty-first century economy, literacy has become even more essential for carrying out these citizenship activities.[10]

66. **J.L.'s Future Access to Justice:** Individuals denied the opportunity to attain literacy are also effectively precluded from constitutionally protected access to the judicial system. In practice, literacy skills are a functional prerequisite to a number of activities that are not only essential to access the courts but are constitutionally protected in their own right, including the retention of an attorney and the receipt of notice sufficient to satisfy due process. Likewise, lack of literacy also precludes meaningful participation in the judicial process, including serving as a

---

[10] *See, e.g.,* Caitrin Blake, *"The Changing Landscape of 21st-Century Literacy,"* Concordia University Nebraska (Aug. 21, 2014), http://online.cune.edu/the-changing-landscape-21st-century-literacy/; Preparing 21st Century Students for a Global Society, National Education Association 5 (2011); Timothy Shanahan, Introduction, in Developing Early Literacy: Report of the National Early Literacy Panel, National Institute for Literacy xii (2008), available at http://lincs.ed.gov/publications/pdf/NELPReport09.pdf.

member of a jury.

67. **J.L.'s Educational Attainment and Future Economic Participation:** Individuals who have been denied access to literacy experience significant barriers to participating in the workforce and securing economic self-sufficiency. The Supreme Court has recognized that "education prepares individuals to be self-reliant and self-sufficient participants in society." *Yoder, 406 U.S. at 221.* National data backs up what is readily apparent: individuals with low literacy are often unable to earn wages adequate to support themselves and their families, and they are less likely to be employed at all. These trends begin with educational attainment: students who lack literacy skills are less likely to graduate from high school, and those who do are unprepared for admittance and success in post-secondary education. Data from the National Association of Adult Literacy("NAAL"), which is sponsored by the U.S. Department of Education's National Center for Education Statistics reflects that individuals with the lowest levels of literacy are less likely than their peers to graduate from high school and succeed in post-secondary education.

68. Data from the Bureau of Labor statistics shows that greater educational attainment is positively correlated with higher median weekly earnings and negatively correlated with unemployment.[11] The chances of children in the lowest income quintile making it to the highest quintile nearly quadruples with a college degree,[12] but a low-income individual without a

---

[11] U.S. Bureau of Labor Statistics, Employment Projections, http://www.bls.gov/emp/ep_chart_001.htm

[12] Exec. Office of the President, Increasing College Opportunity for Low Income Students: Promising Models and a Call to Action (2014), *see* https://www.whitehouse.gov/sites/default/files/docs/white_house_report_on_increa sing_college_opportunity_for_low-income_students_1-16-2014_final.pdf.

college degree will very likely remain in the lower part of the national earnings distribution.[13] Sadly, if J.L.'s denial of access to literacy is left to continue, this means he is unlikely to ever escape from poverty.

69. Adults with low literacy face a significant economic disadvantage, earning lower wages and experiencing higher unemployment rates. NAAL data reveals that 43% of adults with the lowest levels of literacy live in poverty, as compared to only 4% of those with the highest levels of literacy. Adults with lowest levels of literacy who work full time are more likely to be low-wage workers. Even controlling for educational attainment and all other personal characteristics, adults who had difficulty filling out forms were more likely to be low-wage workers. And low-literacy adults are less likely to be employed at all. Those with the lowest literacy levels were 16.5 times more likely than those in the highest literacy group to receive public assistance in the past year.[14]

70. The damage lack of literacy does to employment prospects can be seen in the numbers of applicants from Detroit who cannot pass the entrance exams for the plumbing and electric unions, written exams that also require basic mathematical skills. This in turn affects Detroit as a whole, which cannot find sufficient local labor to rebuild areas that have remained burnt out for decades, or build new housing, or do other work necessary to restore the city center to life.

---

[13] Michael Greenstone *et al.*, The Hamilton Project, Thirteen Economic Facts About Social Mobility and the Role of Education (2013).

[14] *See,* William C. Wood, *Literacy and the Entry-Level Workforce: The Role of Literacy and Policy in Labor Market Success* (analyzing NAAL data).

71. **J.L.'s Future Is Incarceration and Crime:** "Illiteracy is perhaps the strongest common denominator among individuals in correctional facilities."[15] Research shows a strong association between low levels of educational attainment and the onset, frequency, persistence, and severity of delinquency.[16] One study found that reading failure was more predictive of aggression in confined delinquent adolescents than any other factor considered, including age, family size, number of parents present in the home, rural versus urban environment, socioeconomic status, minority group membership, or religious preference.[17] A report sponsored by the U.S. Department of Education asserts that "literacy and criminality are umbilically joined;"[18] another sponsored by the U.S. Department of Justice argues that "the link between academic failure and delinquency, violence, and crime is welded to reading failure."[19] Youth with pronounced reading difficulties are vulnerable to marginalization in their schools and lifelong risk of involvement in the juvenile and criminal justice systems.[20] One of the first national studies of the link between reading failure and delinquency found that the average reading ability of incarcerated adolescents was at the fourth-grade level and that more than one

[15] William Drakeford, *The Impact of an Intensive Program to Increase the Literacy Skills of Youth Confined to Juvenile Corrections*, 53 J. of Correctional Educ. 139, 139 (2002).

[16] *See, e.g., Center on Crime, Communities, and Culture, Education as Crime Prevention: Providing Education to Prisoners,* Research Brief (1997); Denise C. Gottfredson, *School-based Crime Prevention, in Preventing Crime: What Works, What Doesn't, What's Promising* (1995); Eugene Maguin & Rolf Loeber, *Academic Performance and Delinquency, in Crime and Justice: A Review of the Research* (1996).

[17] 0 Dennis L. Hogenson, *Reading Failure and Juvenile Delinquency*, 24 Bull. of the Orton Soc. 164 (1974).

[18] Anabel P. Newman *et al.,* National Center on Adult Literacy, *Prison Literacy: Implications for Program and Assessment Policy* (1993).

[19] Michael S. Brunner, Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, *Reduced Recidivism and Increased Employment Opportunity Through Research-Based Reading Instruction (1993)*

[20] Peter E. Leone *et al., Organizing and Delivering Empirically Based Literacy Instruction to Incarcerated Youth, 13 Exceptionality 89 (2005).*

third of the youth were illiterate.[21] A more recent study examining reading comprehension of detained and committed youth found that the average reading ability of incarcerated adolescents has since decreased.[22] According to the National Assessment of Adult Literacy Prison Survey, at least half of all incarcerated adults surveyed scored "basic" or "below basic" in each of three literacy categories: prose, document, and quantitative.[23] This means the adults lacked the literacy skills to perform such everyday tasks as following directions using a clearly labeled map, or determining what time medicine can be taken based on a prescription drug label.[24] Only 5% of incarcerated adults had literacy skills that were "proficient."[25] J.L.'s paternal grandfather, and great-grandfather were both in the Michigan criminal justice system and did not graduate high school. J.L.'s father (Plaintiff) is fighting to keep J.L. out of the criminal justice system, and to afford him a chance in life.

72. **J.L.'s Future Health Outcomes:**  The link between literacy and health outcomes has likewise been extensively documented in social science and medical literature. In fact, literacy skills are more predictive of an individual's health status than are race, income, employment status, education level, or age.[26] At least two studies have shown that health disparities in both race and educational attainment were attenuated and, in some cases, eliminated after

---

[21] Brunner, *supra* note. 19

[22] Leone, *supra* note 20, at 95.

[23] Elizabeth Greenberg *et al., Literacy Behind Bars: Results from the 2003 National Assessment of Adult Literacy Prison* Survey 13 (2007). According to the survey, 56% of incarcerated adults scored "basic" or below in prose literacy; 50% in document literacy; and 80% in quantitative literacy.

[24] *Id.* at 6-7.

[25] *Id.* at 13.

[26] Jennifer F. Wilson, *The Crucial Link Between Literacy and Health*, 139 Ann. of Internal Med. 875 (2003).

accounting for literacy.[27] Literacy plays an essential role in child and adolescent health in particular: research has repeatedly shown that children with low literacy experience worse health outcomes and behavior.[28]

73. One study of adolescents from low-income neighborhoods found that youth who read two years or more below grade level were more likely to engage in risky behaviors and be in a physical fight that required medical treatment than youth who were reading at grade level.[29] Pursuant to the September 5, 2019 psychiatric evaluation of J.L. it is documented that this child wants to harm or kill himself or others. On August 23, 2023 at approximately 2:00 PM J.L. experienced aggravated, felonious assault at 1122 West Forest Avenue, Detroit, Michigan. The aggravated, felonious assault was committed by several Black-American juveniles some with extensive criminal records. *See, Exhibit 2.*  As a proximate result of the aggravated, felonious assault, J.L. sustained a severely broken jaw and numerous injuries. J.L.'s unaddressed intellectual and serve academic deficiencies place him in direct harm of future violent assaults and even death.

74. Furthermore, on the issue of J.L.'s future health outcomes multiple studies have demonstrated the link between literacy and health outcomes in the management of chronic

---

[27] Somnath Saha, *Improving Literacy as a Means to Reducing Health Disparities*, 21 J. of Gen. Internal Med. 893 (2006); *see also* Barry D. Weiss *et al.*, *Health Status of Illiterate Adults: Relation Between Literacy and Health Status Among Persons with Low Literacy Skills*, 5 J. of the Am. Bd. of Family Practice 257 (1992).

[28] Darren DeWalt & Ashley Hink, *Health Literacy and Child Health Outcomes: A Systematic Review of the Literature*, 124 Pediatrics S265 (2009).

[29] Terry C. Davis *et al.*, *Low Literacy and Violence Among Adolescents in a Summer Sports Program*, 24 J. of Adolescent Health 401–11 (1999).

diseases such as diabetes,[30] asthma,[31] and HIV.[32] Death rates for chronic disease, communicable

diseases, and injuries have been shown to be inversely related to literacy.[33] Lack of literacy

impedes the ability to make appropriate health decisions and according to Proliteracy, "an

excess of $230 billion a year in health care costs is linked to low adult literacy."[34]

### (iv.)   The Tradition of Compulsory Education in the United States Guarantees J.L.'s Literacy Right

75. Literacy's essential role in the maintenance of democracy is reflected in education's

unique status as not only a public good that we have committed to make available to all children

since the earliest days of our republic, but also an activity in which participation is mandatory

and coerced through compulsory education laws. That is, access to literacy is not only

guaranteed to every child, it is required of every child, creating a special relationship between

the state and children between the ages of 6 and 18. The universal provision of public education

has deep roots in U.S. history and laws. Every state constitution includes a provision establishing

a state duty to provide public education. Indeed, as early as the Articles of Confederation in

1781 the Continental Congress imposed the development of public schools as a condition for

admitting states into the union. The Supreme Court has recognized that "providing public

schools ranks at the very apex of the function of a State." _Yoder, 406 U.S. at 213_. States have

---

[30] Dean Schillinger _et al._, _Does Literacy Mediate the Relationship Between Education and Health Outcomes? A Study of a Low-Income Population with Diabetes_, 121 Pub. Health Reps. 245–54 (2006).

[31] Carol A. Mancuso & Melina Rincon, _Impact of Health Literacy on Longitudinal Asthma Outcomes_, 21 J. of Gen. Internal Med. 813–17 (2006).

[32] Seth C. Kalichman _et al._, _Adherence to Combination Antiretroviral Therapies in HIV Patients of Low Health Literacy_, 14 J. of Gen. Internal Med. 267–73 (1999).

[33] Rima Rudd _et al., Literacy and Health in America_, Educ. Testing Service, 5 (2004).

[34] _See_ "Adult Literacy Facts," Pro-Literacy, https://proliteracy.org/Resources/Adult-Literacy-Facts

actualized this duty by investing significantly in schools. 2013 Census Bureau data shows that states collectively spend almost 30% of their budgets on education.

76. The compulsory nature of education is likewise an essential feature of the American political system. Schooling is compulsory for all children in the United States; every state in the union has had a compulsory education law since at least 1918. Michigan's law, for example, dates to 1871 and now requires every child from ages six to eighteen to attend school full-time. *Mich. Comp. Laws § 380.1561.* These compulsory attendance laws reflect a national judgment that education is so essential to the maintenance of democracy and the ability to participate in public and private life that compelling it is justified. The cruel irony is how does L.D., E.D. J.L. avail himself of a compulsory education when he faces the daily threat of violence at school and community from other juveniles. To avoid being the victim of violence L.D. and E.D. children like J.L. miss school days, or become violent actors themselves.

### (v.)    *J.L.'s Exclusion from Access to Literacy Creates an Enduring Stigma*

77. Given the universal provision of literacy and its supreme importance to civic, political, and economic participation, excluding children from the opportunity to become literate marks them with a badge of shame and indignity that profoundly affects them for the rest of their lives. The *Plyler* Court's finding that the "stigma of illiteracy" takes an "inestimable toll" on the "social economic, intellectual, and psychological well-being of the individual," *457 U.S. at 222-23*, is borne out by decades of social science research. Severe literacy deficits inflict immeasurable damage to the mental health and self-esteem of students and require greater resilience to remediate with each passing year. Studies have demonstrated a significant

34

relationship between reading level and mental health, with one finding that the psychological

health of subjects with extremely low reading levels was comparable to that of populations with

severe psychosocial disabilities.[35] Students with low literacy may act in ways too frequently

labeled as disruptive or defiant in the classroom, in order to deflect being seen by others as a

student who cannot read.

78. The denial of access to literacy also creates a discrete underclass in our society, which

"presents most difficult problems for a Nation that prides itself on adherence to principles of

equality under law." *Plyler, 457 U.S. at 219*. The denial of literacy has long been used as a tool to

subordinate marginalized groups. Indeed, the denial of access to literacy was employed as a

badge of slavery—a tactic, as the Court has recognized, used to subordinate and dehumanize

slaves, and to deprive them of legal and human rights.[36] Later, literacy requirements were used

as tools to discriminate against subordinated populations by barring them from voting.[37]

79. Reacting against such stigma, and acknowledging the power of literacy, Black-Americans

have placed a special value on acquiring literacy since the time of slavery. Even under the yoke

of slavery, when learning to read was prohibited, some slaves devised creative and subversive

---

[35] Weiss, *supra* n. 27 at 257.

[36] *Regents of Univ. of California v. Bakke, 438 U.S. 265, 387-88 (1978)* ("Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted from his homeland and thrust into bondage for forced labor, the slave was deprived of all legal rights. *It was unlawful to teach him to read*; he could be sold away from his family and friends at the whim of his master; and killing or maiming him was not a crime. The system of slavery brutalized and dehumanized both master and slave.") (emphasis added).

[37] *See, e.g.*, *Katzenbach v. Morgan, 384 U.S. 641, 653-54 (1966)*; *see also Oregon v. Mitchell, 400 U.S. 112, 147 (1970) (*Douglas, J., partial concurrence) ("[Literacy tests] have been used at times as a discriminatory weapon against some minorities, not only Negroes but Americans of Mexican ancestry, and American Indians").

means to do so. When slavery ended, those who had acquired literacy became the first teachers of their fellow freed people, called on society to assist in teaching, building schools, and supporting teachers, and claimed education as a right.[38] During this period, the literacy rate among Black-Americans rose sharply from 5% at the end of the Civil War to 50% by 1900. This commitment to education persists within the Black-American community to this day.

80. The student body population of DPS is approximately 81.6% Black, 13.9% Latino, 2.5% white, 1.5% Asian, and about 2% other.[39] Today, in the 21st century, it is a Black-American controlled municipal government under the auspices of the State of Michigan which denies J.L. literacy, *IDEA* rights, and subordinates him to a life of poverty, sickness, crime and premature death.

81. This denial of access to literacy to a discrete group of students (such as J.L.) demeans and excludes them, resulting in separate and unequal schooling that "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown,* 347 U.S. at 494 (1954).

### (vi.)   *DPS failed to provide J.L. Literacy because it is a continuing failed system, and Michigan is Ultimately Responsible*

82. The State of Michigan is ultimately responsible for complying with all constitutional

---

[38] Heather Williams, Self-Taught: African American Education in Slavery and Freedom (2007); James D. Anderson, The Education of Blacks in the South, 1860-1935 (1988).
[39] https://www.usnews.com/education/k12/michigan/districts/detroit-public-schools-community-district-113404#:~:text=The%20student%20body%20at%20the%20schools%20served%20by,and%200.1%25%20Native%2Hawaiian%20or%20other%20Pacific%20Islander.

mandates regarding public education. But it has particular responsibility for the schools in Detroit, as in 1999 to about 2016 it took direct controlled over DPS. During this period of State management and control, the Detroit schools have been decimated through disinvestment and deliberate indifference which today adversely impacts J.L.Today, DPS children like J.L. are in a precarious condition characterized by indefensibly low achievement scores, low academic achievement, high drop-out rates, illiteracy, and high school diplomas which have no value.

83. According to information from the National Assessment of Education Progress examination results for 2015, prior to COVID, Michigan is ranked last—43 out of 43 reported jurisdictions—in reading proficiency for fourth grade Black-American students.[40] In fourth grade reading and math, about 91% of Black-American students are below proficiency.[41] In eighth grade reading, 91% of black students are below proficiency in reading and 95% are below proficiency in math.[42] DPS students ranked last in reading and math proficiency among all big-city school districts.[43] Today, indigent children of color like J.L. within DPS are still not proficient in reading and math.

---

[40] *See* Nat'l Ctr for Educ. Stats., 2015 Reading Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results (2016), *available at* http://www.nationsreportcard.gov/reading_math_2015/#?grade=4
[41] *See id.*; Nat'l Ctr for Educ. Stats., 2015 Mathematics Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results (2016), *available at*
http://www.nationsreportcard.gov/reading_math_2015/#?grade=4.
[42] *Id.*
[43] See Nat'l Ctr. for Educ. Stats., 2015 Mathematics TUDA Assessment Report Card (2016), *available a*t
http://www.nationsreportcard.gov/reading_math_2015/#?grade=4; Nat'l Ctr for Educ. Stats., 2015 Reading TUDA Assessment Report Card (2016), *available at*
http://www.nationsreportcard.gov/reading_math_2015/#?grade=4

**(ALLEGATION-3) MICHIGAN IS RESPONSIBLE AND LIABLE TO J.L. FOR PUBLIC EDUCATION PURSUANT TO STATE LAW**

84. In Michigan, the ultimate legal obligation for providing education and for protecting legal rights with respect to education rests with the State. Michigan's State Constitution was derived from the *Northwest Ordinance of 1787*, which conditioned Michigan's statehood on its setting aside land to be used for funding public schools. Article III of the Northwest Ordinance provided: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, *schools and the means of education shall forever be encouraged.*" (Emphasis added.)

    *(i.)    Michigan Constitution guarantees J.L.'s free public education and the State has failed to execute a policy to insure J.L. a free public education pursuant to the Michigan Constitution*

85. The State's founding Constitution—as well as its three successive Constitutions— retained language and added additional language defining the State's role in providing for public schools. Michigan's current State Constitution mandates that "[t]he Legislature shall maintain and support a system of free public elementary and secondary schools as defined by law," *Mich. Const., art. VIII, § 2,* and vests "leadership and general supervision over all public education" in the State Board of Education, *id. art. VIII § 3*. Throughout its history, the Michigan Supreme Court has interpreted these provisions to establish the State's ultimate decision-making authority over and legal obligation to supervise the Michigan public school system. In 1917, for example, the Michigan Supreme Court declared, "We have repeatedly held that education in this State is not a matter of local concern, but belongs to the State at large." *Bd. of Educ. of City of Grand Rapids v. Bacon, 196 Mich. 15, 17 (1917*). Under Michigan's constitutional structure,

local school districts are creations and agents of the State. The Michigan Legislature created local school districts for the administrative purpose of effectively delivering public education, and these districts possess only those powers that the State has delegated to them, either expressly by statute or otherwise.

86. Similarly, Michigan's public-school academies, commonly known as charter schools, are subject to the same constitutional provisions as the local school districts. *Mich. Comp. Laws § 380.501(1)* ("A public school academy is a public school under *section 2 of article VIII of the state constitution of 1963*, is a school district for the purposes of section 11 of article IX of the state constitution of 1963 . . . and is subject to the leadership and general supervision of the state board over all public education under *section 3 of article VIII of the state constitution* of 1963."). Charter schools are thus "under the ultimate and immediate control of the state and its agents." Council of Organizations & Others for Educ. About *Parochiaid, Inc. v. Governor, 455 Mich. 557, 573 (1997)*. Like traditional public schools, charter schools are subject to the leadership and supervision of the State Board of Education to the same extent as are all other public schools. *Id. at 583-84.* The Board has powers of supervision over all public education, *Mich. Comp. Laws § 388.1009*, and has the same constitutional authority over charter schools as it does over traditional public school districts. *Council of Organizations & Others for Educ. About Parochiaid, Inc., 455 Mich. at 584.*

87. The State's role in overseeing Michigan's schools has increased with time. For example, In 1994, the passage of Proposal A shifted responsibility for school. funding and authority to determine funding levels from local municipalities to the State. Proposal A expressly eliminated

the ability of local taxpayers to approve new taxes to contribute to the schools' general funds. And, in 2013, the legislature passed Public Act 96, which granted Michigan's Treasurer and State Superintendent, in consultation with the school district, the power to dissolve school districts.

88. While the State of Michigan has ultimate obligation for ensuring access to literacy in all Michigan schools, the State has an additional, even greater responsibility with respect to DPS because the State was the *de facto* administrator of the school district for approximately fifteen years. This period was characterized by primary or exclusive State control over all aspects of the DPS, with little to no local role in decision-making; and, this State control was an absolute failure which still impacts children like J.L. today.

89. For example, in 2011 the Michigan legislature transferred all decision-making authority over DPS to a State-appointed "Emergency Manager." The emergency manager could unilaterally exercise any authority typically residing in a school board or school superintendent. *See Mich. Comp. Laws § 141.1554(f).* This state action failed, and today J.L is deprived of *FAPE*, and conditions necessary for meaningful learning and teaching to occur have not materialized.

## (ALLEGATION-4) DECIMATION OF DETROIT PUBLIC SCHOOLS, FAILURE TO EDUCATE J.L., AND INJURY

90. The Detroit Public Schools were under the direct authority of the State of Michigan for approximately 15 years. During that period, the State's disinvestment and deliberate indifference contributed to a precipitous decline in DPS that left the approximately 100,000 children of Detroit, overwhelmingly low-income students of color, without the ability to meet their basic educational needs. Although aware of the State's failure to educate children, the

State failed to remedy this massive systemic educational deprivation.  J.L. as an indigent L.D., E.D. child is a current victim of this past systemic State failure.

91. The State's 15-year administration and management of the Detroit schools ushered in and hastened a period of dramatic decline. Achievement scores have remained abysmal— for example, between 2010 and 2013, DPS's overall proficiency scores for seventh grade reading ranged from 23.9% to 33% proficient, compared to a statewide range of 55.6% to 62%. Fifteen years of State's control was marked by hostile decisions adversely impacting the education of minority children that would never be permitted in predominantly white school districts. Today, the standardized test scores of children similarly situated to J.L. are still unacceptable and much lower than majority students statewide.

**(ALLEGATION-5) CONTINOUS FAILED STATE INTERVENTIONS TO ADDRESS LITERACY CRISIS IN DETROIT, AND J.L. HAS A FUNDAMENTAL RIGHT TO LITERACY PIURSUANT TO _GARY B. V. WHITMER, 957 F.3d 616 (6th Cir. 2020)_ WHICH HAS BEEN VIOLATED**

92. The State's first response to the literacy crisis in Detroit was superficial, ill-considered, and counterproductive, driven by Lansing bureaucracy and political considerations instead of the students' educational well-being. Indeed, the State's 15-year interventions in the Detroit education system can best be summarized as reactive efforts to apply a band-aid over the acute and obvious symptoms of the devastating effects of the State's long-term disinvestment and deliberate indifference.

### (i.)    _Gary B, et al,. v. Whitmer, et al. 957 F.3d 616 (6th Cir. 2020)_

93. Next, the Sixth Circuit Court of Appeals ruled 2-1 in _Gary B., et al v. Whitmer, et al.  957 F.3d 616 (6th Cir. 2020)_ held that Detroit children have a fundamental right to a basic education.

*Id. 678. Gary B., et al,* went on to hold:

> Access to a foundational level of literacy—provided through
> public education—has an extensive historical legacy and is so
> central to our political and social system as to be "implicit in
> the concept of ordered liberty." *Washington v. Glucksberg,*
> *521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)*
> (quoting *Palko v. Connecticut , 302 U.S. 319, 325–26, 58 S.Ct.*
> *149, 82 L.Ed. 288 (1937)*, overruled by *Benton v. Maryland,*
> *395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).* In short,
> without the literacy provided by a basic minimum education,
> it is impossible to participate in our democracy. *Id. 642.*

94. Pursuant to *Gary B., et al,* J.L. has a fundamental right to a basic education; but, still today Michigan has not addressed the root causes of its failures to provide a basis minimum education in any systematic or meaningful way to J.L. or other similarly situated indigent children of color in Detroit.

**(ALLEGATION-6) M-STEP STANDARDIZED TEST SCORES PROVE DEFENDANTS' FAILURE TO PROVIDE LITERACY AND FAPE TO J.L. SUCH FAILURE VIOLATES *IDEA*, AND *GARY B, ET AL, V. WHITMER, ET AL, 957 F.3d 616, 642 (6th Cir. 2020)*, AND THE MICHIGAN CONSTITUTION.**

95. The State's historic deliberate disinvestment in and indifference to the needs of Detroit schoolchildren has had catastrophic consequences for J.L's current access to literacy, and *FAPE,* as well as other similarly situated indigent children of color. The ALJ was provided with J.L.'s M-STEP and standardized test records which conclusively proved his abysmal failures, the lack of literacy, and the lack of *FAPE.* Even though the documentary evidence from standardized examination scores was clear and convincing that J.L. was not provided *FAPE* or literacy pursuant to *GARY B*, *Id. p. 642* nevertheless the ALJ arrogantly overlooked the legitimate needs of this L.D., E.D. child and with indifference denied J.L. *IDEA* benefits guaranteed by Congress.

96. Historical data collected and maintained by the State shows, the literacy instruction provided in DPS' schools is so wholly insufficient that perhaps ninety percent or more of the students are unable to meet state proficiency standards. Many students, like J.L., are multiple grade levels below their peers in other schools throughout the State. This abysmal achievement data reflects a statewide system of education that has functionally excluded J.L. and similarly situated children from its reach.

### (i.)     The Michigan Student Test of Educational Progress ("M-STEP") is very significant

97. Student performance data collected by the State has long established that students at DPS' schools are effectively denied the opportunity to achieve proficiency in literacy, particularly as compared to schools elsewhere throughout the State. The Michigan Student Test of Educational Progress ("M-STEP") measures students' progress toward achieving state-mandated academic content standards. Beginning in 2014-15, the State has required the administration of the M-STEP in the following grades and subjects: English and Math in grades 3-8 and 11; science in grades 4, 7, and 11; social studies in grades 5, 8, and 11. The Michigan Educational Assessment Program ("MEAP") measured the previous state standards prior to the adoption of Common Core in 2014-15. For years, students in DPS' schools have disproportionately failed to meet the proficiency standards established by the State in all content areas. J.L. is literally years behind.

98. In addition, national data show that students in DPS' schools are lagging far behind their peers in the rest of the country. Professor Sean Reardon and a team of researchers in the Stanford Graduate School of Education have analyzed state assessment data for grades three

through eight for each of the 12,000 school districts in the country, data generated and collected pursuant to the No Child Left Behind Act in order to make state-by-state comparisons. This historic data showed that students in the DPS schools are, on average, 2.3 grade levels below their actual grade level in basic reading proficiency. J.L. presented substantial documentary evidence to the ALJ that all his M-STEP scores where many, many years behind. DPS' schools are among the poorest performing schools in Michigan, and children like J.L. are denied literacy and *FAPE*.

### *(*ALLEGATION-7) DEFENDANTS' DENIAL OF LITERACY AND FAPE TO J.L. AND THOSE SIMILARILY SITUATED, DENIES THEM GRADUATION AND COLLEGE ATTENDANCE, AND VIOLATES RIGHTS

99. The low proficiency rates in DPS' schools have devastating consequences for educational attainment and college and career preparedness. As social science research demonstrates, low academic achievement and a personal perception of incompetency negatively impact student motivation, engagement, and mental health, which frequently lead to dropping out.[44] Among high school graduates, students with very low proficiency may lack the credentials, including standardized tests scores and grades, necessary for admission to many colleges and universities. And unfortunately, many low-skilled students who do matriculate to a college or university find that they are many years behind their peers and unprepared for college-level work. J.L. does not have the academic skills to graduate and attend college because of Defendant's denial of literacy and *FAPE* to him. Therefore, J.L.'s rights to literacy and *FAPE* are violated by Defendants.

---

[44] *See, e.g.,* NAT'L RESEARCH COUNCIL, INST. OF MED., ENGAGING SCHOOLS: FOSTERING HIGH SCHOOL STUDENTS' MOTIVATION TO LEARN 13-44 (2004); Fred M. Newmann *et al., The Significance and Sources of Student Engagement, in STUDENT ENGAGEMENT AND ACHIEVEMENT IN AMERICAN SECONDARY SCHOOLS* 11-39 (Fred M. Newmann ed., 1992).

**(ALLEGATION-8) THERE ARE INSUFICIENT ALLOCATED RESOURCES, TRAINED SPECIAL EDUCATIONAL PROFESSIONALS, SMALL CLASS SIZES, SECURITY, AND TRANSPORTATIN SERVICES TO PROVIDE J.L. AND STUDENTS SIMILARILY SITUATED WITH LITERACY AND *FAPE*.**

100.     There is failure to deliver evidence-based literacy instruction, *FAPE,* and intervention programs in DPS' Schools because of: (i) insufficient allocated resources; (ii) insufficient number of special educational professionals; (iii) appropriate small class sizes; (iv) insufficient number of security; and, (v) appropriate school transportation services. Therefore, the universally abysmal achievement outcomes are the inevitable consequences of a systemic failure. This lack of resources to necessary to provide J.L. and similarly situated children with literacy, and *FAPE* is a legal obligation upon the State to provide.

101.     Experts agree that meaningful access to literacy can be delivered, including in schools serving demographics of students similar to DPS' schools, through a high-quality literacy-focused program and curriculum. Yet Plaintiffs' schools lack the capacity to provide effective literacy instruction at the elementary or adolescent levels or to intervene with appropriate remediation for students who have fallen behind. At all of Plaintiffs' schools, there is no evidence-based program for delivering access to literacy and for remediating past and ongoing deprivations. This includes lack of qualified staff, necessary training, instructional materials and tools, protocols for regular assessment and follow up interventions, and identification and elimination of conditions impeding access.

### *(i.)*     Intervention and Remediation for J.L.

102.     Furthermore, none of DPS' schools can deliver effective intervention or remediation for students like J.L. who have failed to achieve basic literacy skills in the early

45

elementary years or to develop adolescent knowledge capabilities. Intervening with students who are far behind, in particular, requires one-on-one time that is not feasible when a single teacher is serving a large classroom. J.L. requires one-on-one instruction.

    *(ii.)*    **Extreme Heat, and Necessity for Air-Conditioned Summer School for *ESY***

103.    Absent or malfunctioning heating and air-conditioning systems subject students and teachers to extreme temperatures, sometimes necessitating school closings or early dismissal and thereby frequently preventing effective instruction and meaningful learning. DPS' schools periodically have experience classroom temperatures that range from so cold the students can see their breath to above 90 degrees, depending on the time of the year. *ESY* must be provided J.L. at an air-conditioned building.

**(ALLEGATION-9) FAILURE TO PROVIDE J.L. A SAFE SCHOOL ENVIRONMENT FOR LEARNING.**

104.    DPS also lacks the capacity to provide J.L. and other similar students they serve a safe and non-violent environment in which to learn.

    *(i.)*    *Absence of Support to Address Trauma and Social-Emotional Health*

105.    DPS serves high numbers of low-income students, foster youth, homeless youth, students in the criminal justice system, and students who have experienced or witnessed violence. J.L. reported in a September 5, 2019 psychiatric evaluation that he wanted to harm himself at school. Also, J.L. was the recent victim of aggravated/felonious assault where his jaw was broken by other juveniles from his community associated with his school. *See, Exhibit 2.*

106.     Defendants have failed to provide sufficiently trained professionals to address trauma that J.L. and similarly situated children experience in school.  For example, after a Detroit area Hamilton student was kidnapped and murdered, his classmates were not provided any opportunity to grieve. No additional counselors were brought in, and the teachers were not offered any support or training on how to speak with the students about the tragedy. Instead, on the day the police found the boy's body, the only school-wide reaction was an announcement by loudspeaker to remind the students, who were using their phones to share details about what happened and to communicate their grief, that cell phones were not allowed at school.[45]

107.     Juvenile gangs, and individual wrongdoers, harass and intimidate L.D. and E.D. children like J.L. in school, and continue wrongful acts against vulnerable children after school. No-doubt J.L. "skips" school or classes to avoid confrontation and trauma.

108.     Unaddressed exposure to trauma and adversity impedes a child's ability to learn, and students impacted by trauma require social-emotional and trauma-informed support. But in DPS, teachers and staff are not trained to recognize or respond to childhood trauma, and counseling is not sufficiently available to support children with mental health needs. When children act in ways motivated by the trauma they have experienced, or act out due to embarrassment over their inability to perform basic academic tasks successfully, the DPS' response is to punish and exclude them from the classroom, rather than to implement restorative practices for support and healing. J.L. has been suspended, expelled, and punished.

---

[45] *See, Gary B, et al. v. Richard Snyder, et al., ECF No. 1, pp. 95-95, ¶139.*

**(ALLEGATION-10) UNSUPPORTED AND UNSTABLE TEACHING STAFF AND SUPPORT STAFF INJURE J.L. AND OTHERS SIMILARILY SITUATED**

109.    Plaintiffs' schools still lack a sufficient number of stable and qualified teachers, special education teachers, support staff, clerical staff, security, and janitorial staff.

### *(i.)    Vacancies and Lack of Qualified, Full-Time Teachers, Professionals, and staff Injured J.L. and others Similarly Situated.*

110.    Given the challenging teaching and learning conditions in DPS' schools, unsurprisingly these schools are historically difficult to staff with permanent teachers and administrators and experience high teacher turnover. Although nationwide there is a current need for more teachers due to the pandemic, DPS' dearth of qualified professionals and support staff predated the pandemic. State and DPS failures to adequately staff DPS schools with qualified teachers, professional, and support staff has injured J.L. and similarly situated children in violation of their rights. Failure to provide adequate support(s) to students who have experienced adversity also results in burnout and vicarious trauma among teachers. The frequent teacher turnover on DPS campuses predictably creates teaching vacancies, some of which occur during the school year because teachers cannot continue being overworked in these uncomfortable conditions of very large class sizes, inadequate professional and staff support.

111.    Prior to the pandemic in the 2015-16 school year, there were approximately 170 teacher vacancies in the nearly 100 schools that made up the DPS school system.[46] In the 2016-

---

[46] *See* Ann Zaniewski, *DPS Facing Surge of Midyear Teacher Departures*, DETROIT FREE PRESS (Nov. 26, 2015), available at http://www.freep.com/story/news/local/michigan/detroit/2015/11/26/dps-teachersleaving/76311802/.

2017 school year, there were up to 200 vacancies just before the start of the school year.[47] Filling these vacancies with new teachers who possess the necessary background to achieve success in teaching literacy proved difficult to impossible then. Instead, these classes were covered by non-certificated paraprofessionals, substitutes, or misassigned teachers who lack any expertise or knowledge in the course content. Today, because of the pandemic no-doubt this situation with DPS has worsened.

112.    In addition, in today's Detroit market, qualified short-term substitute teachers often cannot be obtained. The remedy for this problem is for Defendants to increase the pay for substitutes. Defendants cannot balance their budgets by denying children like J.L. their rights to basic literacy and *FAPE*.  Increased pay will in turn attract more qualified substitute teachers. As a matter of law the State of Michigan has this legal obligation to improve substitute instruction in DPS.

### (ii.)    *Legislation Which Permitted Non-Certificated Teachers Injured J.L. and Others, and is a continuing legacy of problems*

113.    Legislative mis-steps by the State have exacerbated the systemic problem of inadequate academic instruction for current children like J.L. and denied them literacy and *FAPE*. Prior to the pandemic, in June 2016, the State further perpetuated the shortage of qualified teachers in DPS' schools by passing legislation permitting non-certificated

---

[47] *See* Josh Sanburn, *Inside Detroit's Radical Experiment to Save Its Public Schools*, TIME (Sept. 6, 2016), available at http://time.com/4390000/detroit-publicschools-charters-debt/; Ann Zaniewski, *Detroit Schools to Hold Teacher Job Fair to Fill 200 Open Positions*, DETROIT FREE PRESS (Aug. 17, 2016), available at
http://www.freep.com/story/news/education/2016/08/17/detroit-teacher-jobfair/88888604/

instructors to teach in DPS schools. Defendant Governor Gretchen Whitmer was directly

responsible for maintaining this systemic problem in Detroit, *to wit:*

> Gov. Gretchen Whitmer, who signed the temporary
> legislation Monday, said the policy change will keep schools
> open and let students learn from instructors they already
> know. The measure, which lets any district employee with a
> high school diploma apply to fill in for certified teachers,
> expires at the end of the 2021-22 academic year in June.[48]

114.        In 2016 this type of legislation did not apply to any school elsewhere in the State.

Rather, it singled out the children of Detroit for separate and inferior treatment. This 2016

legislative blunder reverberates in DPS today, injures J.L and others, and must be addressed.

Today, children like J.L. still require additional certified teachers to reduce class sizes.

**(ALLEGATION-11) AS A PROXIMATE RESULT OF DEFENDANTS' FAILURE TO PROVIDE A SAFE
SCHOOL ENVIRONMENT TO J.L., HE HAS SUSTAINED PHYSICAL INJURY, EMOTIONAL HARM,
AND DEFENDANTS ARE LIABLE FOR THIS CHILD'S INJURIES.**

115.        J.L. has experienced bullying, fights, assaults, and threats from other school-

juveniles within DPS schools, and in-tun has suffered direct harm from his school situation.  J.L.

has missed school to avoid violent conflicts, bullying, fights, assaults, threats, and harm from

other juveniles.  J.L. reported in a September 5, 2019 psychiatric evaluation that he wanted to

harm himself at school. Also, J.L. was the recent victim of aggravated/felonious assault where

his jaw was broken by other school-juveniles in his community. *See, Exhibit 4.*

---

[48] Deadline Detroit, "Educators troubled that uncertified district workers now can be substitute teachers."  December 28, 2021, available at
https://deadlinedetroit.com/articles/29473/educators_troubled_that_uncertified_district_work
ers_now_can_be_substitute_teachers

116.     Defendants have a common law duty of care to maintain safe schools in Detroit, which protect children like J.L. from violence, serious harm, and injury. Defendants have breached that duty in regard to J.L.

117.     DPS' schools serve high numbers of low-income students, foster youth, homeless youth, and students who have experienced or witnessed violence, and these children frequently require anger management. L.D. and E.D children like J.L. are frequently victimized by violent classmates. Unaddressed exposure to trauma and adversity impedes a child's ability to learn, and students impacted by trauma require social-emotional and trauma-informed support. But in DPS' schools, teachers and staff are not trained to recognize or respond to childhood trauma, and counseling is not sufficiently available to support children with mental health needs.

118.     To make a negligence claim, "a plaintiff must prove that (1) the Defendant owed the Plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the Plaintiff suffered damages, and (4) the Defendant's breach was a proximate cause of the Plaintiff's damages." _Hill_ v. _Sears, Roebuck & Co, 492 Mich 651, 660; 683 NW2d 587 (2004)_. Here, Defendants owed J.L. a legal duty to provide a safe school environment; Defendants breached that legal duty; J.L. suffered damages; and Defendants' breach was the proximate cause of J.L.'s injuries.  Plaintiffs sue for $250,000 compensatory damages, and $500,000 in exemplary damages.

## VI. AVERMENTS

**FIRST CAUSE OF ACTION – Violation of Individuals with *Disabilities Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461*.**

119.      Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

120.      This is an appeal of the 18th August 2023 Decision and Order of Administrative Law Judge (ALJ) Alexander Cartwright, which violated the Individuals with Disabilities *Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461*, federal rights of Plaintiffs, the laws of the United States, and the intent of Congress.

**SECOND CAUSE OF ACTION- J.L. as a disabled student has a fundamental right to literacy pursuant to *Gary B., et el., v. Whitmer, et al, 957 F.3d 616 (6th Cir. 2020)*, and that basic right has been violated.**

121.      Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

122.      Defendants, who are responsible for the education of all public-school students have denied and continue to deny J.L. the fundamental right of access to literacy and fundamental interest in access to literacy, as compared to other students in the State of Michigan receiving an education in Michigan Public Schools.

123.      Defendants were acting under color of state law, thereby violating J.L. basic rights to literacy pursuant to *Gary B., et el., v. Whitmer, et al., 957 F.3d 616 (6th Cir. 2020)*.

**THIRD CAUSE OF ACTION - Violation of *42 U.S.C. § 1983* (J.L. Against All Defendants for Violation his Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution)**

124.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

125.     Defendants, who are responsible for the education of all Michigan public school students and for the system of Michigan public schools, have denied and continue to deny J.L. the fundamental right of access to literacy and fundamental interest in access to literacy, as compared to other students in the State of Michigan receiving an education in Michigan Public Schools, by functionally excluding J.L. from Michigan's statewide system of public education, as described above, in violation of his substantive right to due process of law, his liberty interest, and his right to equal protection under law protected by the Fourteenth Amendment to the United States Constitution.

126.     Defendants were acting under color of state law, thereby violating section 1983.

**FOURTH CAUSE OF ACTION - Violation of *42 U.S.C. § 1983* (J.L. Against All Defendants for Violation his Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution based upon State Created Danger)**

127.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

128.      By the acts and omissions described above, Defendants affirmatively created or increased the risk that J.L. would be exposed to dangerous conditions and violence, which placed J.L specifically at risk, and J.L was harmed as a result.

129.      Defendants knew or should have known that their acts or omissions specifically endangered Plaintiffs.

130.      Moreover, Defendants are aware that J.L. wants to harm himself at school.

131.      Defendants were acting under color of state law, thereby violating section 1983

**FIFTH CAUSE OF ACTION - Violation of the *ADA, 42 U.S.C. § 12101 (a)(1)* (J.L. Against All Defendants for Maintaining a Detroit School System Which Discriminates, Endangers Children with Learning Disabilities, Emotional Disabilities**

132.      Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

133.      The *ADA, 42 U.S.C. § 12101(a)(1)*, provides:  "The Congress finds that—(1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;"

134.      Defendants receive federal monies, and pursuant to the *ADA* must not maintain a system which has discriminatory impact upon the disabled.

**SIXTH CAUSE OF ACTION - (All Plaintiffs Against All Defendants for Declaratory Relief)**

135.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

*136.*     An actual and existing controversy exists between the Plaintiffs and the Defendants because Plaintiffs contend, and Defendants dispute, that Defendants' actions and inactions as described above have violated the *IDEA*, Fourteenth Amendment of the United States Constitution, the *ADA*, and the basic rights to literacy pursuant to *Gary B., et el., v. Whitmer, et al., 957 F.3d 616 (6th Cir. 2020).*

137.     Plaintiffs seek a judicial declaration that the Defendants have violated the foregoing federal rights.

**SEVENTH CAUSE OF ACTION – (All Plaintiffs Against All Defendants for Negligence)**

138.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

139.     J.L has suffered injury at Defendants' school as a proximate result of Defendants' negligence.

140.     Plaintiffs pray for $250,000 in compensatory damages and $500,000 exemplary damages against Defendants for negligence. *See, Hill v. Sears, Roebuck & Co, 492 Mich 651, 660; 683 NW2d 587 (2004).*

## VII. PRAYER FOR REMEDIES FOR PLAINTIFFS

### (a) PURSUANT TO *BOARD OF EDUCATION OF FAYETTE COUNTY V. L.M., 478 F.3d 307, 316 (6th Cir. 2007)* A COURT MAY GRANT PLAINTIFFS COMPENSATORY EDUCATION.

*141.* Here, *sub-judice*, the facts prove that Defendants denied J.L. *FAPE* in violation

of *20 USCA § 1412(a)(1), 34 CFR § 300.303(a)(b)(2), 34 CFR § 300.322*, of *IDEA* and common law.

Pursuant to *Board of Education of Fayette County v. L.M., 478 F.3d 307, 316 (6th Cir. 2007)* a

Court can award J.L. compensatory education.

> An award of compensatory education is an equitable remedy
> that a court can grant as it finds appropriate. *20 U.S.C. § 1415
> (i)(2)(C)(iii); see also, Park ex rel. Park v. Anaheim Union High
> Sch. Dist., 464 F.3d 1025, 1034 (9th Cir.2006)* ("The courts have
> discretion on how to craft the relief and there is no obligation to
> provide a day-for-day compensation for time missed.") (citation
> and quotation marks omitted). *Board of Education of Fayette
> County v. L.M., 478 F.3d, 316.*

142. From April 2022 and currently, J.L. has been denied *FAPE* by Defendants. Here,

*sub-judice*, this Court has the authority to create a compensatory education program which

considers all J.L.'s lost special education time. There are 175 school days in Defendant's

academic year.  Plaintiffs pray for a day-for-day, two hours each day compensation remedy as

follows: (1) From April to June 2022 J.L. missed 48 days; (2) From August 2022 to June 2023 J.L.

missed 175 days; (3) The total days compensation for J.L. is 223.  (4) At two hours per day for

223 days, J.L.'s 2022 to 2023 compensation is 446 hours.  Plaintiffs pray for 446 hours in

compensatory education for J.L.

> A school district's failure to timely assess a high school student
> with an emotional/behavioral disability lead to an administrative
> law judge's ruling that the district provide the student with six

months of compensatory education. *Independent School District No. 11*. *28 IDELR 1144 (1998)*.

---

143.        In *Lewisburg Area School District, 42 IDELR 315, (2004)* a Hearing Officer awarded a student "one full day of compensatory education for each day school was in session" where the student was denied *FAPE*. Here, *sub-judice*, 446 hours of compensatory education for J.L. is proper.

### (b) PURSUANT TO *34 CFR § 300.303(a)(b)(2)* A COURT MY ORDER DEFENDANTS TO EXECUTE APPROPRIATE EVALUATIONS OF J.L.

*144.*        Here, *sub-judice*, the facts prove that Defendants denied J.L. *FAPE* in violation of *34 CFR §300.303(a)(b)(2)*, and *IDEA* common law. Wherefore, Plaintiff prays that this Court will Order Defendants to perform the following evaluations within immediately, *to wit:* (1) a psycho-educational evaluation; (2) a psychiatric evaluation; (3) a speech and language evaluation; (4) an occupational therapy evaluation.  The foregoing evaluations are necessary and proper to ascertain J.L.'s needs, and provide J.L. *FAPE*.

145.        J.L. must be tested for autism because autism is a genetic disability in his family as his father testified.[49] It is imperative that any evaluation of J.L. investigates whether he is on the autism spectrum.  Such information is vital to determine J.L.'s disabilities, and to execute an *IEP* which provides *FAPE* in the *least restrictive environment (LSE)*.

---

[49] *Supra note 2*.

**(c) PURSUANT TO *34 CFR § 300.105* THIS COURT MAY ORDER DEFENDANTS TO EVALUATE AND PROVIDE J.L. NECESSARY AND PROPER ASSISTIVE TECHNOLOGY.**

146.      Plaintiffs pray that this Court will Order Defendants to evaluate and determine

whether J.L. can be awarded a personal computer and tape recorder as assistive technology,

which he needs.

> Both state and local educational agencies have obligations with regard to the provision of assistive technology devices and services. Public agencies must provide such devices and services in order to provide *FAPE*, and the *IEP* team determines, what if any, devices and services are required based on the child's unique and individual educational needs. *Letter to Hutcheson, 30 IDELR 708 (1998).*

147.      Furthermore, *34 CFR § 300.105* determines whether assistive technological

devices are provided to a student:

> Each Public Agency shall ensure that assistive technology devices
> . . .as defined in Sec. 300.5 – 3006 are made available to a child
> with a disability if required as part of the child's

(a.)      special education under *Sec. 30024*;

(b.)      related services under *Sec. 300.22*; or

(c.)      supplementary services under *Sec. 300.26* &

*300.550(b)(2). Jefferson County School DistrictR – 1, 39 IDELR 119, (2003).*

148.      Plaintiffs asserts that J.L. requires a personal computer and a tape recorder as

assistive technology, as part of his special education, related services, and necessary

supplementary services.

**(d) IT IS NECESSARY AND PROPER FOR J.L. TO RECEIVE *ESY* TO PREVENT REGRESSION.**

149.      In *Colchester School District, 30 IDELR 221, 224 (1999)* that case articulated the

factors to consider regarding an award of ESY as follows:

The student is likely to regress in both academic and social skill areas if no *ESY* services are provided. Because retaining and generalizing certain skills is difficult for the student, he needs to have these skills taught and practiced during the year without an extended two-and-a-half-month interruption of services. Although regression in social skills is more difficult to quantify than academic skills, it is increasingly essential to provide him with social skill instruction. Recoupment of skills would occur eventually but, as the student gets older and expectation increases, recoupment is more difficult. With the student's combination of disabilities, attaining self-sufficiency and independence are critical. This is especially so given the fact that his disabilities are likely to continue. The focus of the student's *ESY* services needs to be a combination of functional academic and social skills. These are areas, including self-monitoring, reading comprehension, written expression and organization skills that require continuous instruction. The student's need for services increases as he get older. The vulnerability caused by his disabilities will become more of a problem and liability as he gets older. The student's *ESY* services are an essential part of his *FAPE*. The student's learning will be significantly jeopardized if services are not provided during the summer.

150.     The analysis in <u>*Colchester School District*</u>, *30 IDELR 221, 224 (1999)* is spot on *sub-judice*, and the facts and concepts on ESY are cogent to J.L.'s case. J.L. has three disorders: Oppositional defiant disorder, Attention-deficit/hyperactive disorder, and Language disorder. Moreover, J.L. is severely behind academically. Importantly, J.L. is 13 years old, and falling further behind. Therefore, pursuant to <u>*Colchester School District*</u>, *30 IDELR 221, 224 (1999) ESY* is necessary and proper to prevent J.L.'s regression.

151.     *ESY* is appropriate for students with multiple emotional and cognitive disabilities like J.L. Children like J.L. with multiple disabilities are at greater risk for truancy, suspension, and expulsion. *See, "Educating Children with Dual Cognitive and Emotional Disabilities," 48*

*Maryland Bar Journal 28, 35 (2015).* Educating children with dual cognitive and emotional

disabilities, like J.L., requires greater resources and services.

> The advancement of resources and services available to dual-
> diagnosed students is crucial. "*Educating Children with Dual
> Cognitive and Emotional Disabilities,*" 48 Maryland Bar Journal
> 28, 35 (2015).

152.     Here, *sub-judice*, because of J.L.'s dual cognitive and emotional disabilities *ESY* is

legally necessary and factually proper to prevent his regression.

### (e) J.L.'S NEIGHBORHOOD SCHOOL IS CLOSED IN SUMMER AND HE WILL REQUIRE BUS TRANSPORTATION FOR *ESY.*

153.     J.L.'s local school is closed in summer, and he will require bus transportation for

*ESY*. As a general rule where the child's school of attendance is closed for the summer, the

student will be picked up at their home and transported to the assigned *ESY* site. It is necessary

and proper to provide J.L. bus transportation for *ESY.*

### (f) DEFENDANTS FAILED TO PROVIDE PLAINTIFF-DEQUAN A. NOTCIE OF THE *IEP* MEETING OF J.L. PURSUANT TO *34 CFR § 300.322*. THIS COURT MUST ORDER DEFENDANTS TO PROVIDE PLAINTIFFS NOTICE OF *IEP* MEETINGS.

154.     Pursuant to *34 CFR § 300.322* Defendants were obligated to invite Plaintiff-

Dequan A. to the October 17, 2022 *IEP* Team and REED meetings, and afford Plaintiff-Allen the

opportunity to participate. Defendants violated this law. *34 CFR § 300.322(a) and (b)* provides

the following:

> *§ 300.322 Parent Participation.*
> (a)     Public agency responsibility—general. Each public agency must take steps
> to ensure that one or both of the parents of a child with a disability are
> present at each IEP Team meeting or are afforded the opportunity to
> participate, including—

(1)   Notifying parents of the meeting early enough to ensure that they will have an opportunity to attend; and

(2) Scheduling the meeting at a mutually agreed on time and place.

(b)      Information provided to parents.

(1)   The notice required under paragraph (a)(1) of this section must—
(i)       Indicate the purpose, time, and location of the meeting and who will be in attendance; and
(ii)      Inform the parents of the provisions in *§300.321(a)(6) and (c)* (relating to the participation of other individuals on the *IEP* Team who have knowledge or special expertise about the child), and *§300.321(f)* (relating to the participation of the Part C service coordinator or other representatives of the Part C system at the initial *IEP* Team meeting for a child previously served under Part C of the Act).

155.        Plaintiff-Allen's attendance at the *IEP* Team meetings was imperative for

Defendants to acquire important information, and provide J.L. *FAPE*.

**(g) THIS COURT HAS AUTHORITY TO COMPEL DEFENDANTS TO PROVIDE PLAINTIFF-DEQUAN A.  A FULL AND COMPLETE COPY OF ALL HEARING AND PRE-HEARING TRANSCRIPTS PURSUANT TO *34 CFR § 300.512* AND AT NO CHARGE.**

156.        Defendants' intentional failure to deny Plaintiffs all Hearing transcripts at no

charge in compliance with *34 CFR § 300.512* violated Plaintiffs due process rights of the

Fourteenth Amendment of the United States Constitution. *42 U.S.C. § 1983 Civil Action for*

*Deprivation of Rights.* This Court must immediately order Defendants to provide Plaintiffs the

February 1st, February 23rd, and April 12th 2023 transcripts for use in this federal case.

**(h) THIS COURT MUST ODRER DEFENDANTS TO CONSIDER RESIDENTIAL PLACEMENT OF J.L. IN A PRIVATE SPECIAL EDUCATION SCHOOL BECAUSE OF ITS INABILITY TO PROVIDE *FAPE.***

157.      Defendants are unable to provide J.L. *FAPE* with the *least restrictive environment (LRE)*, thus a residential placement is proper in a private school.  The *IDEA* permits Defendants to place children with disabilities in private schools.  Although Defendants are required to provide *FAPE*, the "public" education requirement does not mandate placement in a public school in all cases.

158.      Certain special needs children may be placed in or referred to a private school or facility by a public agency as a means of providing special education and related services.

159.      The Shortridge Academy Boarding School environment will provide *FAPE,* the *least restrictive environment (LRE)*, safe environment, and is proper for J.L. who has numerous L.D., and E.D. disabilities.  In *Tuscon Unified School District* v. *Murray ex rel. Kline, 33 IDELR 239 (D. Ariz. 2000)* that court found that in some cases residential facilities for disabled children is necessary for *FAPE* with the *least restrictive environment* (*LRE*).

**(i) PLAINTIFF-J.L. HAS A BASIC RIGHT TO LITERACY AS GUARANTEED BY LAW, AND THIS COURT MUST ENFORCE J.L.'S RIGHTS PURSUANT TO *GARY B., ET AL. V. WHITMER, ET AL, 957 F.3d 616 (6th Cir. 2020).***

160.      Just as in the case of *Gary B., et al. v. Whitmer, et al.,*  "[our]. . .plaintiffs have a fundamental right to a basic minimum education, meaning one that can provide them with a foundational level of literacy." *Id. 662.* This Court must find that J.L. has a fundamental right to literacy.

161.     Plaintiffs pray for injunctive relief requiring Defendants and their officers, agents,

and employees to ensure that J.L, has the opportunity to attain literacy.

162.     Plaintiffs pray for the issuance of a declaratory judgment that Defendants actions

and inaction complained of herein violate Plaintiffs' rights under the Fourteenth Amendment of

the United States Constitution, the *IDEA,* and the *ADA*

### *(j)* PLAINTIFFS HAVE A STATUTORY RIGHT FOR ATTORNEYS' FEES AND COSTS PURSUANT TO *THE INDIVIDUALS WITH DISABILITIES EDUCATION IPROVEMENT ACT, 20 U,S.C. § 1400 ET SEQ.*

163.     In the matter at bar, Defendants are responsible for reimbursement of

reasonable attorneys' fees and costs incurred in this matter. "[I]n any action or proceeding

brought under *IDEA*, the court, in its discretion, may award reasonable attorneys' fees to the

parents of the youth who is the prevailing party." *20 U.S.C. § 1415(e)*. Once Plaintiffs

demonstrate prevailing party status, the fee applicants then bears the burden of establishing

that both the hourly rate and the number of hours spent on any particular task is reasonable.  *In*

*re North, 59 F.3d 184, 189 (D.C. Cir. 1995).* A prevailing party "is one who has been awarded

some relief by a court." *See, Alegria v. District of Columbia, 391 F.3d 262.*

### (k) PLAINTIFFS HAVE A STATUTORY RIGHT FOR ATTORNEYS' FEES AND COSTS PURSUANT TO *42 U.S.C. § 1983*.

164.     "The court, in its discretion, may allow the prevailing party, other than the United

States, a reasonable attorney's fee as part of the costs . . . ." *42 U.S.C. § 1988*.  Under *42 U.S.C.*

*§1983*, "[e]very person who . . . subjects, or causes to be subjected, any citizen of the United

States or other person within the jurisdiction thereof to the deprivation of any rights, privileges,

or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." *42 U.S.C.§ 1983*.

### *(l)* PLAINTIFFS PRAY FOR $250,000 IN COMPENSATORY DAMAGES, AND $500,000 IN EXEMPLARY DAMAGES BASED UPON DEFENDANTS' NEGLIGENCE.

*165.*    Plaintiffs pray for $250,000 in compensatory damages and $500,000 exemplary

damages against Defendants for negligence. *See, Hill v. Sears, Roebuck & Co,* 492 Mich 651,

660; 683 NW2d 587 (2004).

### (m) PLAINTIFFS PRAY THAT THIS COURT MAINTAIN JURISDICTION OVER THIS CASE UNTIL ALL JUDICIAL ORDERS ARE COMPLIED WITH BY THE PARTIES.

166.    Plaintiffs pray that this court will maintain jurisdiction over this case until all

orders issued by this tribunal and complied with.

### (n) PLAINTIFFS PRAY THAT THIS COURT SHALL PROVIDE ALL RELIEF IT DEEMS JUST AND PROPER.

**167.**    Plaintiffs pray for all equitable and legal remedies.

Dated: October 25, 2022

Respectfully submitted,

By: */s/ Roy Carleton Howell*
Roy Carleton Howell (P84099)
8003 Parkside Lane, N.W.
Washington, D.C. 20012
Telephone:  (202) 545-0750
Cell: (202) 445-3263
professorhowell1954@yahoo.com